United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3417
_____

United States of America,                    *
                                             *
            Appellee,                        *
                                             *
      v.                                     *
                                             *
Alfred Pemberton, also known as Tig,         *
                                             *
            Appellant.                       *


_____

No. 96-3498
_____

Appeals from the United States
District Court for the District of
Minnesota.


United States of America,                    *
                                             *
            Appellee,                        *
                                             *
      v.                                     *
                                             *
Daniel Brown,                                *
                                             *
            Appellant.                       *

_____

No. 96-3527

_____

United States of America,　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　　Appellee,　　　　　　　 *
　　　　　　　　　　　　　　　　　*
　　　v.　　　　　　　　　　　　  *
　　　　　　　　　　　　　　　　　*
Harold Finn, also known as Skip,　 *
　　　　　　　　　　　　　　　　　*
　　　　　Appellant.　　　　　　  *

_____

Submitted: May 19, 1997
Filed: July 31, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, and BOWMAN and MORRIS
　　　SHEPPARD ARNOLD, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Alfred "Tig" Pemberton, Daniel Brown, and Harold "Skip" Finn appeal their convictions on various charges related to the insurance arrangements of the Leech Lake Band of Chippewa Indians (the Band) in the late 1980s and early 1990s. Pemberton and Finn also appeal their sentences. We affirm the judgments of the District Court.[1]

_____

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

-2-

## I.

Because of the complexity of this case and the many fact-specific arguments raised by the defendants, we relate the facts of this case in somewhat more detail than is customary. Pemberton, Brown, and Finn are enrolled members of the Band. This tale begins in 1985, when Pemberton was secretary-treasurer of the Leech Lake Reservation Business Committee (LLRBC), the five-member governing body of the Band.[2] At the time, Brown was one of three district representatives on the LLRBC, and Finn was the Band's legal counsel.[3]

Before 1985, the Band routinely purchased property-casualty and liability insurance to cover the risks associated with several buildings owned by the Band and several businesses operated by the LLRBC on behalf of the Band. In 1985, however, a crisis in the insurance market threatened to make insurance too expensive for the Band to afford; the only company willing even to quote a premium for the year beginning July 1, 1985 would have increased the previous year's property-casualty premium from $122,000 to $254,000 and the previous liability premium from $31,000 to $187,000. Because of the prohibitive cost, the Band went without insurance for a time in 1985.

At a meeting of the LLRBC on October 1, 1985, Finn and an LLRBC staff member presented a possible solution. As Finn described it, the Band could "self-insure" by depositing funds annually in a segregated bank account and paying claims

---

[2]The LLRBC was later renamed the Tribal Council, an appellation that more appropriately reflects its purpose.

[3]Finn had been secretary-treasurer of the LLRBC in the 1970s, before he attended law school. Brown was elected chairman of the LLRBC in 1988. Pemberton remained secretary-treasurer until 1990, when he lost an election, but he was elected chairman in 1992.

out of that account. Several individuals present at the October 1 meeting testified that Finn stated that the Band would own any funds not used to pay claims, as is typical of self-insurance programs. Finn suggested that he administer the program by collecting the contributions and managing the payment of claims. Witnesses disagreed whether Finn proposed to retain a portion of the contributions as an administrative fee or whether he would render his services pursuant to his retainer agreement with the Band. Because of the possibility that the Band might suffer a large loss in the early years of the plan, before any significant reserves could be developed, Finn suggested that the LLRBC purchase excess insurance coverage from a traditional insurance company. The LLRBC voted unanimously to approve the self-insurance program as described by Finn, and adopted a resolution establishing a corporation named Reservation Risk Management, Inc. (RRM) as "a corporate sub-entity of the Leech Lake Reservation Business Committee." LLRBC Resolution No. 86-26 (Oct. 1, 1985). RRM's charter stated that the company was formed under the authority of the Minnesota Chippewa Tribe (of which the Leech Lake Band is one of six constituent bands) to manage the Band's self-insurance program.

During the next few weeks, it became apparent that insurance companies were unwilling to provide excess insurance coverage to the Band at affordable rates. Finn reported this development at an LLRBC meeting on October 29. At that meeting, the LLRBC voted nevertheless to proceed with the self-insurance program, which was to be administered by RRM, and the LLRBC authorized its chairman and secretary-treasurer to execute the necessary documents. Throughout the next several months, several key documents were executed by LLRBC Chairman Hartley White and Pemberton on behalf of the LLRBC and by Finn on behalf of RRM. For ease of reference, we will refer to these documents as the Subscription Agreement, the Debenture Agreement, the Shareholders' Agreement, and the Insurance Agreement. White testified that he did not believe that all of his purported signatures on these documents were genuine, and he clearly stated that he did not understand the import

of any of these agreements when he signed them.  Instead, he relied on the advice of Finn, whom he considered to be a trustworthy and loyal member of the Band.

The Subscription Agreement gave 25% of the shares in RRM to the LLRBC and 75% of the shares to Finn.  In the Debenture Agreement, Finn and his law partner, Kimball Mattson, pledged to tender as much as $450,000 to RRM if necessary to avoid a shortfall in "Fund C," the fund from which RRM was to pay claims.  RRM was obligated to repay any sums advanced by Finn and Mattson, who also had the option to cancel the agreement on ninety days' notice and receive 20% interest per annum on any balance owed to them by RRM.  In exchange for their standby promises to contribute to RRM, Finn and Mattson were to receive 15% of the premiums collected by RRM.  The Debenture Agreement was executed by Finn on his own behalf and on behalf of RRM; the LLRBC was not a party to this contract.

The Shareholders' Agreement between the LLRBC and Finn described the internal workings of RRM.  Fifteen percent of premiums received were to be deposited in Fund A and paid annually to debenture holders, as described above.  The other 85% of each premium payment was to go into Fund B, to be used for operating expenses, which Finn had previously estimated at $100,000 per year.  Any excess in Fund B was to be regularly transferred to Fund C, from which claims would be paid.  The Shareholders' Agreement stated that the "reserves in Fund C shall belong to the shareholders of RRM" but were not to be distributed to the shareholders except on the dissolution of RRM.  Shareholders' Agreement ¶ 3(b) (Jan. 14, 1986).  In addition, if the LLRBC withdrew from the insurance program any time before October 31, 1990, the LLRBC would forfeit any claim to the assets of RRM, and those assets would be distributed among the other shareholders.

The Insurance Agreement set up a ten-year insurance program at premiums beginning at $300,000 per year and escalating to $450,000 per year (subject to upward adjustment if deemed necessary by the directors of RRM).  RRM agreed to seat two

persons nominated by the LLRBC on the board of directors of RRM. Pursuant to this agreement, RRM issued to the LLRBC an insurance policy providing on its face more than $8 million in property-casualty coverage and $300,000 in liability coverage.

The government's risk-management expert testified that, in combination, these documents created a program that was neither insurance (because RRM did not assume the risk of loss) nor self-insurance (because persons other than the LLRBC had ownership interests in funds remaining after the payment of losses). In particular, the expert testified, the Shareholders' Agreement "essentially took the Band money and gave it to Mr. Finn." Tr. at 475. To demonstrate the workings of the program, she calculated what would have happened if the RRM arrangement had lasted one year, during which the LLRBC suffered no losses, and Finn had waived the forfeiture provision and allowed the LLRBC to retain its equity despite the early cancellation. The LLRBC would have paid $300,000 to RRM, of which 15% ($45,000) would have gone to Finn and his partner pursuant to the Debenture Agreement and another $100,000 (or 33%) would have gone to administrative expenses (essentially to Finn, his firm, and RRM's board members). Of the $155,000 remaining in Fund C, the LLRBC would receive one-fourth ($38,750) when the program was cancelled. Thus, even without any claims or losses (i.e., the best-case scenario from the perspective of the LLRBC), the LLRBC would receive only 13% of its payment back at the end of the year. Not surprisingly, then, the expert concluded that "[t]he RRM documents effectively deprive the Band of what the benefits of self-insurance should have been" and that "the terms of the transaction as a whole were commercially unreasonable in the realm of self-insurance, risk management and insurance." Tr. at 453-54.

In January 1987, the LLRBC appointed Pemberton and Brown as its two representatives on the board of RRM. Shortly thereafter, Pemberton was elected secretary-treasurer and Brown vice-president of RRM. (Finn previously had been named president and was a board member.) Finn's wife and Pemberton's wife also were elected to the five-member board, and each of them gave a proxy to Finn, giving

him effective control of the company. Finn soon transferred some of his equity ownership of RRM to Pemberton and Brown in exchange for their investment of $18,000 and $12,000, respectively, giving Pemberton approximately 7% and Brown approximately 5% ownership of the company.[4]

Later in 1987, an auditor began to audit the Band on behalf of the Department of the Interior for fiscal year 1986. RRM immediately became an issue because the LLRBC's October 1985 resolution established the company as a tribal entity, which would require it to be included in the audit. When the auditor wrote to Pemberton seeking more information about RRM, Finn responded with a letter stating that RRM was chartered by the state of Minnesota and that the LLRBC owned only 25% of the company. (In fact, Finn had organized a state-chartered corporation under the name "Reservation Risk Management, Inc.," a corporation that was evidently inactive. When we refer to "RRM," however, we mean the tribally-chartered company.) The auditor inquired further of Pemberton whether any of the Band's elected officials stood to benefit from the Band's association with RRM. Again, Finn responded: "Please be advised that the Leech Lake Reservation elected officials do not stand to profit from its association with RRM, Inc." Letter from Finn to auditor of Mar. 3, 1988. After some further jousting with Finn, the auditor gave up on RRM and did not include the company in his audit. When the auditor and his partners later had second thoughts, they sent a representation letter to the LLRBC, asking the members to sign if they agreed with certain statements, including the following: "All prior [LLRBC] resolutions establishing some type of control over RRM by the Leech Lake RBC have been rescinded. There are no RBC elected officials who exercise control or who share in the profits of RRM." Letter from auditor to LLRBC officials of Jan. 11, 1989. Brown and Pemberton signed the letter.

---

[4]The parties dispute the source of the funds invested, but it does not matter whether the $30,000 came from accrued leave owed to Pemberton and Brown (as they claim) or from the Band's landfill trust account (as the government claims). Regardless, Pemberton and Brown invested in RRM and received equity stakes.

In 1989, the Bureau of Indian Affairs notified the Band of fraudulent practices involving insurance companies and warned that in the future, all insurance companies doing business with Indian tribes would have to be licensed by the relevant state government. Accordingly, the LLRBC decided to end its arrangements with RRM. Of the approximately $2 million collected by RRM since its establishment, the LLRBC received about $850,000 in a complicated series of transactions when the company was dissolved. During the life of RRM, it paid only $61,000 in insurance claims, while Finn took hundreds of thousands of dollars out of the company--some for cash and some to purchase items such as cars, boats, golf carts, professional football and baseball tickets, and real estate. All three defendants also received thousands of dollars in fees for serving on the board of directors of RRM.

As RRM was finally dissolved in mid-1990, Finn distributed considerable sums to the defendants. On May 2, 1990, Finn purchased an annuity for the benefit of Brown in the amount of $43,500; Brown later applied for a cash payout of 10% of the annuity and received the payout in October. On June 25, 1990, Finn distributed $62,000 to Pemberton, $199,547.10 to Mattson (Finn's law partner), and $286,000 to himself. Ten days later, Finn paid himself another $50,000.

In November 1990, a federal grand jury began investigating RRM. A federal agent served Finn with a grand jury subpoena in January 1991 at the Minnesota capitol building, where Finn had just been sworn in as the first Native American elected to the state Senate. Finn eventually was charged by information in 1994 with a misdemeanor count of misapplying tribal funds, in violation of 18 U.S.C. § 1163 (1988). Finn pleaded guilty, but when he was disappointed in the sentencing court's assessment of the sentencing factors, he exercised his right, pursuant to his plea agreement, to withdraw the guilty plea.

On June 7, 1995, the grand jury returned the indictment that began this case. Finn, Pemberton, and Brown were charged with one count of conspiracy, in violation

of 18 U.S.C. § 371 (1988), and, in varying combinations, with nine counts of felony theft or misapplication of tribal funds, in violation of 18 U.S.C. § 1163; four counts of theft concerning a program receiving federal funds, in violation of 18 U.S.C. § 666 (1988); one count of bribery concerning a program receiving federal funds, in violation of 18 U.S.C. § 666; five counts of money laundering, in violation of 18 U.S.C. § 1957 (1988); three counts of mail fraud, in violation of 18 U.S.C. §§ 1341, 1346 (1988 & Supp. II 1990); two counts of making a false statement, in violation of 18 U.S.C. § 1001 (1988); and one count of obstruction of justice, in violation of 18 U.S.C. § 1503 (1988).

After a seventeen-day trial, a jury convicted all three defendants of conspiracy. In addition, Finn was convicted of four counts of theft or misapplication of tribal funds, four counts of theft concerning a program receiving federal funds, and three counts of mail fraud; Pemberton was convicted of one count of theft or misapplication of tribal funds and one count of theft concerning a program receiving federal funds. The District Court sentenced Finn to fifty-seven months in prison, fined him $25,000, and ordered him to pay restitution of $400,000 to the Band. Pemberton was sentenced to thirty-three months in prison and ordered to repay $66,430 to the Band. Brown was placed on probation for two years, including one year of home detention, fined $7500, and ordered to pay restitution of $31,412.

## II.

Of the many points raised by the defendants on appeal, we consider first several overarching arguments that attack the heart of the government's case.

## A.

The parties agree that all of the crimes charged in this case are subject to the five-year limitation period of 18 U.S.C. § 3282 (1988).  The defendants argue that § 3282 bars this prosecution.  On its face, this argument appears specious, for all of the counts on which the defendants were convicted involve conduct occurring on or after June 13, 1990, less than five years before the date of the indictment.  (For mail fraud, the relevant date is the date of the mailing.  See, e.g., United States v. Eisen, 974 F.2d 246, 263 (2d Cir. 1992), cert. denied, 507 U.S. 998, 1029 (1993); United States v. Dunn, 961 F.2d 648, 650 (7th Cir. 1992).  For conspiracy, the relevant date is the date of the last overt act in furtherance of the conspiracy.  See United States v. Rabinowitz, 56 F.3d 932, 933 (8th Cir. 1995).)

The defendants argue, however, that if there was wrongdoing in this case, it occurred when Finn induced the LLRBC to set up the self-insurance plan that gave him a 75% stake in the proceeds; in other words, according to the defendants, this is a case of fraudulent inducement.  Any theft or misapplication, the argument continues, occurred at the latest in 1989, when the LLRBC made its last payment to RRM.  After that point, the defendants could not have stolen or misapplied RRM's funds, for they owned RRM.  (Actually, they owned only three-quarters of RRM, but the defendants finesse this point by arguing that they kept less than three-fourths of RRM's assets when the company was wound up.)

This argument misses the point that the government's theory of the case, a theory the evidence supports, was that the documents purportedly signed by White on behalf of the LLRBC were fraudulently procured, and therefore that the defendants never had a legitimate claim to the money.  We note that White admitted that he signed the Subscription Agreement--the agreement that purported to give Finn 75% of the equity in RRM--but testified that it said nothing about Finn's ownership when he signed it.  See Tr. at 695-96.  In addition, the evidence shows that RRM kept its funds in bank

accounts that appeared to belong to the LLRBC.  Based on this evidence, the jury could (and apparently did) find that the LLRBC did not in fact assent to Finn's ownership of three-fourths of RRM, and the agreement was therefore void.  It then follows that the defendants' conversion of RRM's funds to their own purposes in 1990 was unlawful, and this conversion occurred within five years before the defendants were indicted.  We therefore reject the defendants' argument as being out of step with the charges and the jury's findings.

**B.**

The defendants next argue that 18 U.S.C. § 1162 (1988), commonly known as Public Law 280, strips the federal government of jurisdiction over the crimes charged in the indictment, giving jurisdiction instead to the state.  The Magistrate Judge[5] rejected this argument in a lengthy opinion addressing the defendants' pretrial motions. See United States v. Finn, 919 F. Supp. 1305, 1330-38 (D. Minn. 1995) (report and recommendation), adopted, United States v. Finn, 911 F. Supp. 372 (D. Minn. 1995); United States v. Pemberton, 911 F. Supp. 375 (D. Minn. 1995); United States v. Brown, 911 F. Supp. 375 (D. Minn. 1995).  We agree.

We need not explore the defendants' argument at length, for it is foreclosed by our recent decision in United States v. Stone, 112 F.3d 971 (8th Cir. 1997).  In Stone, which involved a violation of the Airborne Hunting Act, 16 U.S.C. § 742j-1, we held that Public Law 280 does not divest the federal government of jurisdiction over all criminal matters occurring in Indian country.  See Stone, 112 F.3d at 973.  Rather, we held, Public Law 280 transfers from the federal government to the state of Minnesota

---

[5]The Honorable Raymond L. Erickson, United States Magistrate Judge for the District of Minnesota.

jurisdiction over only those crimes encompassed by 18 U.S.C. §§ 1152 and 1153.[6] <u>See</u> <u>id.</u> Crimes of general applicability--that is, actions that Congress has declared illegal regardless of where they occur--are not affected by the enactment of Public Law 280 and remain within the subject-matter jurisdiction of the federal courts. <u>See</u> <u>id.</u>; <u>cf.</u> <u>Stone v. United States</u>, 506 F.2d 561, 563 (8th Cir. 1974) (discussing crimes of general applicability), <u>cert. denied</u>, 420 U.S. 978 (1975); Felix S. Cohen, Handbook of Federal Indian Law 366 n.156 (Rennard Strickland et al. eds., 1982 ed.) (citing examples of federal laws unaffected by Public Law 280). Because all of the crimes with which the defendants were charged are crimes of general applicability, the defendants' challenge to the District Court's jurisdiction fails.[7]

## C.

We next consider several arguments raised by Finn, all of which concern claims of prosecutorial misconduct. For the most part, these arguments are tangentially related to a dispute that arose during the government's investigation of this case and the obstruction-of-justice charges against Finn that resulted. The key document involved in this dispute is an invoice in the amount of $7600 sent by RRM to the LLRBC for additional insurance services; when Finn received payment from the LLRBC, he paid the same amount to the executive director of the LLRBC, Myron Ellis. According to sworn statements of Ellis and the LLRBC's accountant, when a grand jury subpoenaed

---

[6]Section 1152 "extends to Indian country federal enclave jurisdiction over crimes in which the situs of the offense is an element." <u>Stone</u>, 112 F.3d at 973. Section 1153 makes unlawful certain enumerated offenses, including murder, kidnapping, and burglary, committed by an Indian in Indian country. <u>See</u> 18 U.S.C. § 1153.

[7]Finn suggests that the crime of theft or misapplication of tribal funds is a "uniquely Indian" offense rather than a crime of general applicability. Finn Br. at 27 n.43. We disagree, for 18 U.S.C. § 1163 forbids stealing from a tribe anywhere in the country. <u>See</u> <u>United States v. McGrady</u>, 508 F.2d 13, 16 (8th Cir. 1974), <u>cert. denied</u>, 420 U.S. 979 (1975).

documents from the Band in 1991, Finn told the accountant to destroy the invoice. The Band eventually turned over another copy of the invoice in response to a 1993 subpoena. The kickback allegedly paid to Ellis was the basis of the 1994 misdemeanor charge against Finn, and Finn's order to the accountant to destroy the invoice was the justification for an obstruction-of-justice sentence enhancement that caused him to withdraw his guilty plea to the misdemeanor. Finn was later charged with a substantive count of obstruction of justice in the 1995 indictment, but this charge was dismissed by the government during trial.

Finn first argues that the government's decision to charge him with multiple felonies after he withdrew his guilty plea to a misdemeanor constituted vindictive prosecution. As Finn frames the issue, the government retaliated against him for his exercise of "a legal right." Finn Br. at 13.[8] Finn has adduced no evidence of actual vindictiveness on the part of the government; accordingly, his claim can succeed only if it is proper to presume vindictiveness from the circumstances. The government seeks to clarify the circumstances by pointing out that the misdemeanor plea resulted from a plea bargain and that Finn was warned that he could be charged with more serious crimes if he insisted on going to trial. Although we have no reason to disbelieve the government, we need not venture outside the record to determine that Finn's argument must be rejected. "[T]he mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified." United States v. Goodwin, 457 U.S. 368, 382-83 (1982); see also Bordenkircher v. Hayes, 434 U.S. 357, 364-65 (1978) (holding that prosecutor's threatening more serious charges if defendant does not plead guilty does not violate due process). Accordingly, we do not presume vindictiveness in this case, and Finn's argument fails to carry the day.

---

[8]Finn does not identify what "legal right" he exercised, but we will assume he is referring to his right to a trial by jury.

Finn also complains that an agent of the Department of the Interior perjured himself before the grand jury by stating that the Band never turned over the invoice in response to subpoenas. This argument is meritless for several reasons. First, "an indictment returned by a legally established and unbiased grand jury 'is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence.'" United States v. Roach, 28 F.3d 729, 739 (8th Cir. 1994) (quoting United States v. Calandra, 414 U.S. 338, 345 (1974)). Second, even if we consider the merits of the argument, any prejudice to Finn from this testimony was dissipated when the obstruction charge was dismissed during trial. In fact, because the defendants cross-examined the agent thoroughly at trial and exposed his failure to discover the copy of the invoice among the documents turned over to the grand jury in 1993, the incident probably caused more damage to the government's case than it did to Finn's defense.

Finn next argues that the government's mention of the obstruction-of-justice allegations in its opening statement was improper. As best as we can tell, Finn appears to be arguing that because the government discovered that the invoice had not been destroyed, it should have abandoned the obstruction charge before the trial began. As the District Court found when Finn made a similar argument in the guise of a Brady claim, however, the fact that a copy of the invoice survived does not show that Finn did not order the accountant to destroy it. Nothing in Finn's argument shows a lack of good faith on the part of the prosecutor, see United States v. Wallace, 453 F.2d 420, 422 (8th Cir.) (noting that prosecutor's good faith is controlling question), cert. denied, 406 U.S. 961 (1972), and the court instructed the jury that opening arguments are not evidence. As a result, we are unable to conclude that the government's mention of the obstruction evidence amounts to misconduct.

Finally, we consider Finn's objection to the testimony of one of the government's expert witnesses. At trial, an IRS agent testified that a particular financial transaction conducted by Finn constituted money laundering. After a bench conference, the

District Court struck the testimony and instructed the jury to disregard it; the court repeated this instruction during the final jury charge. Finn suggests that expert testimony that a defendant committed a crime is invariably improper, citing Federal Rule of Evidence 704(b). That rule, however, prohibits only testimony on the issue of mens rea, while Rule 704(a) permits testimony on any other issue, even if "it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a); see also United States v. Posters 'N' Things Ltd., 969 F.2d 652, 661 n.6 (8th Cir. 1992) (permitting expert to testify that particular elements of money laundering were established), aff'd, 511 U.S. 513 (1994). We need not determine exactly how Rule 704 should apply in the instant case--a difficult question, because an opinion that the defendant committed a crime may include a suggestion that he or she had the requisite mental state--although we suggest that a cautious prosecutor should avoid eliciting from a witness an answer to this ultimate question. Cf. United States v. Whitted, 11 F.3d 782, 785 (8th Cir. 1993) (holding that expert may not testify that child was sexually abused because opinion is not helpful to the jury). In this case, Finn was acquitted of all the money-laundering charges, curing any direct prejudice to him, and we conclude that any spillover prejudice to Finn on the other charges in the indictment was adequately cured by the court's repeated instruction to the jury to disregard the testimony.

## III.

We now turn to several issues raised by Pemberton and Brown, including their arguments that the evidence is insufficient to support their convictions. When we examine the sufficiency of the evidence, we consider the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the verdict, and we will reverse only if no reasonable jury could have found the defendants guilty beyond a reasonable doubt. See United States v. Stands, 105 F.3d 1565, 1570 (8th Cir. 1997), petitions for cert. filed, Nos. 96-9316, 96-9420, 96-9541 (U.S. June 5, 17, 18, 1997).

## A.

We deal first with Pemberton's challenge to the sufficiency of the evidence. In addition to conspiracy, Pemberton was convicted of two substantive counts relating to the disbursement of the funds of RRM as the company was wound up in June 1990. Pemberton argues that he was merely a pawn of Finn, the mastermind of the RRM scheme, and that he had no knowledge that RRM was a scam; his payout in 1990, he says, was merely a fair return on his legitimate investment in RRM in 1987. This is, of course, one possible interpretation of the facts, but it is the interpretation most favorable to Pemberton, not the one most favorable to the verdict. As in many cases, there is little direct evidence of Pemberton's knowledgeable participation in the conspiracy and the distribution of the proceeds of RRM, but the jury was entitled to rely on the significant circumstantial evidence indicating that Pemberton knew Finn was defrauding the Band and that he joined in Finn's efforts to do so. See United States v. Jewell, 893 F.2d 193, 194 (8th Cir. 1990) (recognizing that knowledge and intent may be established by circumstantial evidence). The jury could have considered, for example: (1) that Pemberton created a conflict of interest by investing in RRM while he was secretary-treasurer of the LLRBC; (2) that Finn's notes from the first RRM board meeting show that the "Leech Lake agreements" were discussed while Pemberton was present; (3) that Pemberton, along with White, signed a letter authorizing one of the LLRBC's banks to transfer to RRM the $30,000 that was used to purchase shares for Pemberton and Brown in RRM; (4) that the auditor for the Department of the Interior directed several letters to Pemberton expressing concerns about the relationship between the LLRBC and RRM; (5) that Pemberton signed the representation letter stating that no LLRBC officials stood to profit from RRM; and (6) that Pemberton's "investment" of $18,000 (assuming that the money was even his to invest) more than tripled in about three years, when it was obvious that his profits could have come only at the expense of the LLRBC, of which he was an officer.

Reasonable jurors could disagree about whether Pemberton conspired with his co-defendants and intentionally stole from his fellow tribal members. Nevertheless, the jurors before whom Pemberton was tried did not disagree, and we cannot say that no reasonable juror could have found him guilty. See United States v. Weston, 4 F.3d 672, 674 (8th Cir. 1993) ("[I]f the evidence rationally supports two conflicting hypotheses, we cannot disturb the conviction.").

**B.**

Brown, who was convicted on the conspiracy count only, presents a closer case on the sufficiency question, but much of the circumstantial evidence that suffices to support Pemberton's conviction is equally probative of Brown's participation in the conspiracy. In particular, Brown's signature on the auditor's representation letter, which contained the false statement that no LLRBC officials would share in RRM's profits, reasonably could lead the jury to the inference that Brown intended to mislead the auditor and the Interior Department. Brown suggests that he did not know that the statement was false, but the jury quite reasonably could have determined that, as a director and shareholder of RRM, he was well aware of his financial interest in the company.

**C.**

The government also presented a theory of "willful blindness" regarding Pemberton's and Brown's knowledge of and participation in the conspiracy. Brown does not challenge the substance of the District Court's instruction on the willful-blindness issue, but he does take issue with the manner in which the court decided to give the instruction. We conclude that the District Court erred, but the error was not prejudicial.

In examining this claim, we must consider the rather unusual happenings as the trial came to a close. Although the record is not entirely clear, the parties agree that the court ruled at the instruction conference that it would give a willful-blindness instruction. When the parties returned to the courtroom the following morning to begin closing arguments, the court told counsel that it had determined that the instruction was not appropriate and that it would not be given. The government and Finn then presented their arguments, and the court recessed for lunch. After lunch, the court informed counsel that it had changed its mind again and would give the willful-blindness instruction.[9] When Brown objected, the court ruled that the government would not be permitted to argue willful blindness in its rebuttal unless Brown raised the issue in his closing argument. Brown then proceeded with his argument, avoiding the subject, and the government did not argue it in rebuttal.

Federal Rule of Criminal Procedure 30 provides that "[t]he court shall inform counsel of its proposed action upon the requests [for jury instructions] prior to their arguments to the jury." The District Court clearly violated this rule by changing its mind about the instruction in the midst of closing arguments. Nevertheless, a violation of Rule 30 is not reversible error unless the complaining defendant is prejudiced by the error. See, e.g., Eisen, 974 F.2d at 256; United States v. Horton, 921 F.2d 540, 547 (4th Cir. 1990), cert. denied, 501 U.S. 1234 (1991); United States v. Gaskins, 849 F.2d 454, 458 (9th Cir. 1988); United States v. Smith, 629 F.2d 650, 653 (10th Cir.), cert. denied, 449 U.S. 994 (1980); cf. United States v. Dawson, 467 F.2d 668, 675 (8th Cir.

---

[9]Brown suggests that the District Court's decision to give the instruction was influenced by the misconduct of Finn's counsel during his closing argument. Neither the record nor common sense supports this claim. There is no reason to believe that the court would seek to punish Brown and Pemberton for the misdeeds of Finn's attorney, and no one suggests that the instruction was intended to punish Finn, since the willful-blindness theory could not plausibly have applied to him. The court's reprimand of Finn's attorney properly included cautionary language that the jury should not hold the reprimand against any of the defendants, including Finn himself.

1972) (affirming conviction where defendant was alerted that instruction would probably be given), cert. denied, 410 U.S. 956 (1973).  For this purpose, a defendant is prejudiced if he is "unfairly prevented from arguing his defense to the jury or [is] substantially misled in formulating his arguments."  Smith, 629 F.2d at 653.  No such prejudice exists in this case.

Brown argues that he was prejudiced because the government would have been permitted to respond if he had argued the willful-blindness issue.  Of course, the government would have been permitted to respond to Brown's arguments in any event, regardless of when the District Court ruled on the instructions, because the government is entitled to the last word in rebuttal.  See Fed. R. Crim. P. 29.1.  The District Court's ruling that the government could not argue the issue in rebuttal unless Brown opened the door prejudiced no one but the government.[10]  Nor was Brown misled in formulating his argument, for the District Court had indicated at the instruction conference the previous day that the instruction would be given.  Counsel for Brown could have been misled only if he prepared his argument after the court first changed its mind--that is, if counsel had prepared his argument during the closing arguments of the government and Finn.  Brown does not suggest that this was the case, and we think it entirely unlikely.  Accordingly, because Brown was not prejudiced by the District Court's violation of Rule 30, the error does not entitle him to a new trial.

## IV.

We now consider several arguments proffered by Finn.  Before considering some of Finn's more substantial arguments in detail, we pause to reject several other

---

[10]Brown also suggests that he should have been given an opportunity for surrebuttal on the issue.  This argument makes no sense, for even if the District Court had followed the proper procedure and finalized the instructions before the government began closing arguments, Brown would not have been entitled to speak twice on any issue.

arguments briefly. What we have written already with respect to Pemberton's and Brown's conspiracy convictions is sufficient to demonstrate our belief that the government presented sufficient evidence to convict Finn of conspiracy. Nor is there merit in Finn's contention that 18 U.S.C. § 1346, which broadened the scope of the mail and wire fraud statutes following the Supreme Court's decision in McNally v. United States, 483 U.S. 350 (1987), cannot be applied to a conspiracy that began before the statute was enacted and continued after its enactment. This argument is foreclosed by United States v. Blumeyer, 114 F.3d 758, 766 (8th Cir. 1997), and United States v. Garfinkel, 29 F.3d 1253, 1259 (8th Cir. 1994). Finally, Finn (along with his codefendants at times) argues repeatedly that because there was insufficient evidence to convict him of one or another of the substantive charges against him, his conspiracy conviction, which resulted from a general verdict on a charge that he conspired to commit several substantive crimes, must also be reversed. We disagree. Finn's argument contains two significant flaws. Not only is it quite possible and permissible for a defendant to be convicted of conspiring to commit an offense and to be acquitted of that same substantive offense, see United States v. Townsley, 843 F.2d 1070, 1086 (8th Cir.), vacated in part on other grounds, 856 F.2d 1189 (8th Cir. 1988) (en banc), cert. dismissed, 499 U.S. 944 (1991), but also the Supreme Court has held explicitly that the failure of proof on one of several alternative conspiratorial objects does not void the conspiracy conviction if the proof is sufficient as to any one of the objects of the conspiracy, see Griffin v. United States, 502 U.S. 46, 56-57 (1991). We conclude that Finn's attack upon his conspiracy conviction lacks merit.

## A.

Finn challenges the sufficiency of the indictment with respect to the charges that he violated 18 U.S.C. § 666 by stealing from a program receiving federal funds. Finn argues that the indictment did not allege that he was an agent of the Band on the dates on which he was accused of converting the Band's property and that the District Court should have granted his pretrial motion to dismiss the § 666 charges on this ground.

Although we agree with Finn that agency is an element of a § 666 offense, see 18 U.S.C. § 666(a)(1), (d)(1), we believe that the indictment does sufficiently charge that Finn was the Band's agent on the relevant dates. (We also note that the District Court's jury instruction on this point was correct.)

> An indictment is sufficient if it (1) contains the elements of the charged offense and fairly informs the defendant of the charge against which he or she must defend and (2) enables him or her to plead double jeopardy as a bar to further prosecution. . . . Unless the indictment is so defective that by no reasonable construction can it be said to charge the offense for which the defendant[] [was] convicted, we will uphold it.

Stands, 105 F.3d at 1575 (citations omitted). When the issue is whether an element of an offense has been omitted, our inquiry is whether the omission is one of substance or one of form only. See United States v. Mallen, 843 F.2d 1096, 1102 (8th Cir.), cert. denied, 488 U.S. 849 (1988).

Finn correctly notes that the § 666 counts contain no language expressly informing him that the government would be required to prove that he was an agent of the Band. Three factors, however, when considered in combination, make the indictment sufficient nonetheless. First, the § 666 counts cite the statute, which clearly makes agency an element of the offense. Finn points out that we held in United States v. Camp, 541 F.2d 737, 740 (8th Cir. 1976), that a reference to the relevant statute cannot supply an element omitted by the grand jury. This case is distinguishable from Camp, however, because of other relevant allegations made by the grand jury. The introductory section of the indictment, which the indictment incorporates by reference into all of the counts, alleges that Finn was the Band's attorney "from on and about 1983 to June 1, 1990." Grand Jury Indictment at 3. Although all of the § 666 offenses were alleged to have occurred between June 13 and July 5, 1990, the use of "on or about" (which is what we must assume the grand jury meant when it said "on and about") in an indictment incorporates dates "within a reasonable time of the date

-21-

specified." United States v. Duke, 940 F.2d 1113, 1120 (8th Cir. 1991). The indictment further alleges that the same acts by Finn that violated § 666 also violated 18 U.S.C. § 1163, and in the § 1163 counts, the indictment alleges that Finn was an agent of the Band on the relevant dates. In these circumstances, it is apparent that the grand jury's omission was one of form rather than substance, and so Finn's challenge to the sufficiency of the indictment must fail.

**B.**

Finn next argues that the government did not prove that RRM was an "Indian tribal organization" for purposes of 18 U.S.C. § 1163. We disagree.[11]

Whether an entity is an Indian tribal organization is a question for the jury to decide. See United States v. White Horse, 807 F.2d 1426, 1429 (8th Cir. 1986). In White Horse, the relevant organization was a telephone authority chartered pursuant to tribal law and wholly owned by the tribe. We reversed the defendants' convictions because the district court erred by instructing the jury that the telephone authority was an Indian tribal organization as a matter of law, but we refused to grant the defendants judgments of acquittal. See id. at 1430-31 & n.2. In other words, we necessarily concluded in White Horse that the government had presented sufficient evidence to show that the authority was a tribal organization, but we reversed because the wrong factfinder made the decision. Nearly identical evidence was presented in the instant case. RRM was established under tribal authority as a subordinate body politic of the LLRBC. We find it difficult to believe that any corporation established under tribal law

_____

[11]We do not necessarily need to reach this issue, as the indictment also charged Finn with stealing from the Band, which is undoubtedly an Indian tribal organization. See 18 U.S.C. § 1163 (including "any tribe, band, or community of Indians" within definition). Out of an abundance of caution, however, and because Finn's argument raises an important issue regarding the status of tribally-chartered entities, we will consider the status of RRM.

-22-

as a sub-entity of a tribe would not be an Indian tribal organization (although it remains, of course, a jury question), and Finn surely has not made such a case for RRM.

Nor do we find persuasive Finn's argument that United States v. Zephier, 916 F.2d 1368 (8th Cir. 1990), controls in this case. Zephier involved a school founded by fifteen tribes and organized as a charitable corporation under state law. See id. at 1369-70. We explicitly noted the state-law character of the corporation when we laid out several factors indicating that a state-law corporation may be an Indian tribal organization, including the factor that Finn now emphasizes: "the entity must be patterned after or deliberately have conformed its operations to federal laws for Indian affairs." Id. at 1372. We do not believe that the government is required to meet this element of Zephier in the case of a corporate subsidiary chartered by a tribe; in fact, the requirement does not especially make sense in the context of RRM. Federal laws governing Indian affairs do not necessarily have anything to do with a corporation founded pursuant to tribal authority. Because tribal law gives the corporation its legal existence, a corporation chartered under tribal law necessarily has a closer legal relationship with the tribe than does a state-chartered corporation that is merely controlled by one or more tribes. Accordingly, we believe that the only relevant factor for the jury's consideration in the case of a corporation chartered under tribal authority is the degree of control over the corporation possessed by the tribe. See id. (outlining four factors relevant to determination of "de facto control"); White Horse, 807 F.2d at 1430 ("[T]he Telephone Authority constituted an Indian tribal organization if there was a sufficient nexus between the Tribe and the Telephone Authority."). Although Finn argues that in fact he had full control of RRM, he does not seriously dispute that the government established a sufficient nexus between the Band and RRM. We conclude that the government's evidence sufficiently supports the jury's finding that RRM was an Indian tribal organization.

## C.

Finally, we consider Finn's challenge to his mail-fraud convictions. Here Finn argues that the mailings did not further his scheme to defraud the Band and the state of Minnesota. Again, we disagree.

The mail-fraud charges relate to two of Finn's boat purchases. Finn bought a twenty-foot boat in 1987 with RRM funds and registered it in the name of Finn & Mattson, his law partnership. Three years later, Finn bought a twenty-one-foot boat with RRM funds laundered through the LLRBC; he registered this boat in his own name. Minnesota passed a statute in 1989 requiring many boats, including the two boats at issue here, to have certificates of title beginning January 1, 1991. See Minn. Stat. §§ 86B.820 to -.920 (1996). After the law took effect, Finn applied for certificates of title for both boats, and the state sent the certificates to him through the mail.

Finn argues first that the government cannot premise one of his mail-fraud convictions on the sales-tax return that was filed by the dealer that sold him the twenty-one-foot boat in 1990. The dealer that sold the boat testified that because Finn indicated that he was purchasing the boat on behalf of the LLRBC, he did not charge Finn sales tax on the purchase and he did not submit sales tax to the state. Finn nevertheless argues that the dealer's sales-tax return was not false because, according to the testimony of one of Finn's witnesses, the return did not report the sale of the boat as a sale to an exempt entity. This argument is irrelevant, for an innocent mailing--that is, a mailing that is entirely true--may satisfy the mailing element of a mail-fraud conviction. See Schmuck v. United States, 489 U.S. 705, 715 (1989); United States v. Ribaste, 905 F.2d 1140, 1142 (8th Cir. 1990). In any event, the jury reasonably could have believed the proprietor, who testified that he did not pay the tax to the state.

-24-

Finn presents a better argument with respect to the other two counts of mail fraud. These counts were premised on the state's mailing of certificates of title to Finn after the passage of the new statute. Finn argues that because these mailings were not "part of the execution of the scheme as conceived by the perpetrator at the time," Schmuck, 489 U.S. at 715, they cannot support mail-fraud convictions. We will accept Finn's version of events and assume that he was entirely unaware that certificates of title might be required some time after he purchased the boats, although we suspect that an attorney and sportsman such as Finn was probably aware of the titling statute, which was passed in 1989, when he bought the twenty-one-foot boat in 1990. On Finn's theory, the fraud was complete once he registered the boat in his name (or the name of his partnership), because he could then transfer title merely by signing over the registration card to a purchaser.[12] Finn argues that the state's subsequent requirement that he obtain a certificate of title was not foreseeable and that his receipt of titles through the mail did not further his fraud in any way.

We think Finn's view of the situation is overly simplistic. For starters, the language in Schmuck that the mailing must be "part of the execution of the scheme as conceived by the perpetrator at the time" is directed to a different issue: what might be called an "inculpatory" mailing. Schmuck argued that the mailings for which he was convicted (certificates of titles to cars that he had sold after rolling back their odometers) actually worked against him by increasing the risk that he would be caught. See id. The Court rejected his argument, holding that it is irrelevant "whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." Id. Finn's case is a bit different: here, Finn believed he had successfully defrauded the Band, but then a change in state law

---

[12]We simplify matters a bit when we say that "the fraud was complete." In fact, as the government points out, the indictment alleged that all of Finn's RRM-related actions from 1985 on were a part of his scheme to defraud. Our statement that the fraud was complete is really a simpler way of saying that the mailings could not have furthered the fraud because Finn had already obtained complete control of the boats.

required him to take another step if he wished to retain the fruits of his fraud or convert them to cash. Given the change in the law, the mailings in the instant case increased the chances that Finn's fraud would be successful, for they enabled him to present a purchaser with prima facie proof of title in a new and official form. Finn's mailings, therefore, are not the inculpatory sort of communications envisioned in Schmuck; they are communications that he did not foresee but that he nevertheless was required to make in order to continue the fraud. Finn suggests no authority that a mailing of this type may not suffice to support a mail-fraud conviction, and we see no reason why such a mailing should not be adequate.

In essence, Finn seems to be arguing that a defendant who has successfully fleeced his victim and gained possession and control of the victim's property may not be convicted of mail fraud based on subsequent mailings. This is not the law. See United States v. Lane, 474 U.S. 438, 451-52 (1986) ("Mailings occurring after receipt of the goods obtained by fraud are within the statute if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'") (quoting United States v. Maze, 414 U.S. 395, 403 (1974)). Ultimately, whether a mailing furthers a scheme to defraud is a factual question for the jury to decide. See United States v. Freitag, 768 F.2d 240, 244 (8th Cir. 1985). The jury in the instant case reasonably could have found that, given the change in the law, the titles mailed to Finn at his request furthered his scheme to defraud the Band of its property.

## V.

We have considered the defendants' numerous remaining arguments, including those challenging their sentences, and have concluded that they are without merit. Accordingly, the judgments of the District Court are affirmed.

-26-

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.