United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1661

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeals from the United States |
| | * | District Court for the Western |
| Rochelle K. Whatley, | * | District of Missouri. |
| | * | |
| Appellant. | * | |

_____

No. 97-1663

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| J. Victor Whatley, | * |
| | * |
| Appellant. | * |

_____

No. 97-1789

_____

United States of America,        *
                                      *

        Appellee,       *
                                      *

v.                   *
                                      *

Michael Todd Landess,      *
                                      *

        Appellant.      *


_____

No. 97-1790

_____

United States of America,        *
                                      *

        Appellee,       *
                                      *

v.                   *
                                      *

Harold B. Barnett, Jr.,      *
                                      *

        Appellant.      *

_____

Submitted:  September 8, 1997

Filed:  January 7, 1998

_____

-2-

Before HANSEN, JOHN R. GIBSON, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Rochelle Whatley and her husband, Victor Whatley, were the principals in a telemarketing firm called Midwest Marketing Concepts (MMC). Mrs. Whatley was president and sole shareholder, while Mr. Whatley served variously as a consultant and a general manager. MMC employed the two other appellants in this case, Michael Landess and Harold Barnett, as telemarketing salesmen.

We state the facts as the evidence would support a reasonable jury in finding. Working from phone lists obtained from other telemarketing firms, an MMC salesman would call an individual and say that he or she had been selected for MMC's "V.I.P. Bonus Round," and was guaranteed to win one prize from a list that typically included a new Saturn automobile, a pair of Lucien Picard watches, a $10,000 savings bond, and a pound of gold, along with other, much less valuable items ("gimme gifts"). All that MMC asked in exchange was that the individual purchase "Say No To Drugs" materials and donate them to a local church or school.

If a customer expressed interest, he or she was sold a "starter box" of the "Say No to Drugs" materials, which ranged in price from $400 to $800. The materials were in fact shipped to the specified organization, but the total cost to MMC of those materials was only about $40. The MMC sales representative pushed each customer into having the materials delivered directly to the designated organization, so that the customer would not be disappointed with the amount of materials that his or her money had purchased.

Customers were chosen for their susceptibility to this scheme. Sales representatives focused their sales efforts on people whom they perceived to be old or particularly lonely. They used a variety of tactics to get individuals to send money to MMC. Although it was nowhere in MMC's internal phone scripts, some of the people called were promised that they would win a specific big prize and were given false statements as to the value of the "gimme gift." When a customer asked what the odds were of receiving the car or other prizes, sales representatives were told to change the subject and to repeat the promise that the customer was certain to win one of the four major prizes.

Individuals who purchased the materials would invariably receive only the cheapest gift on the list. Their names, however, would be put back in MMC's file to be "reloaded," and they would be called again and told that they had a chance to win one of the larger prizes if they bought additional "Say No to Drugs" materials. If a customer tried his or her luck again, he or she would again receive a "gimme gift." No one, whether a one-time donor or one who was "reloaded," ever received an award other than a "gimme gift."

The Whatleys were indicted on one count of conspiracy to commit wire fraud and 106 counts of wire fraud, in violation, respectively, of 18 U.S.C. § 371 and 18 U.S.C. § 1343. In addition, Mrs. Whatley was indicted on six counts of money laundering, in violation of 18 U.S.C. § 1957(a), § 1957(d)(1). A jury convicted the Whatleys of conspiracy but acquitted them on all 106 counts of wire fraud; the jury convicted Mrs. Whatley on five of the six money-laundering counts against her. Mrs. Whatley was sentenced to 60 months in prison on the conspiracy charge and 63 months in prison on the money-laundering counts; Mr. Whatley received a 60-month prison sentence on the conspiracy charge. Mr. Landess and Mr. Barnett each pleaded guilty to one count of conspiracy to commit wire fraud and one count of wire fraud and were sentenced, respectively, to 30 months and 24 months in prison.

The Whatleys appeal their convictions and their sentences. Mr. Landess and Mr. Barnett appeal their sentences. We affirm the judgments of the district court.[1]

I.

After closing arguments in this case, the jurors began deliberating at 12:30 p.m.; at 4:00 p.m., they informed the district judge that they were unable to reach a verdict. The jurors then retired for the evening and resumed their deliberations the following morning. After two and a half more hours of deliberating, they were still unable to reach a verdict. The court, on its own motion, and over the objection of the defense, then gave the jury an *Allen* charge, *see Allen v. United States*, 164 U.S. 492, 501-02 (1896), to encourage it to continue deliberating and, after four more hours, it reached verdicts on all counts.

The Whatleys assert that the district court erred because it did not give the complete *Allen* charge contained in Eighth Circuit Model Criminal Jury Instruction 10.02. It is true that the district court failed to read any part of the third paragraph of this instruction, which reiterates the burden of proof; the instruction was otherwise correct and complete, however, directing jurors to deliberate with a view to reaching a verdict, so long as one could be reached without violating any juror's convictions about the ultimate truth of the matter before them.

We examine the correctness of jury instructions as a whole and not atomistically, *see United States v. Park*, 421 U.S. 658, 674-75 (1975), and we will not reverse a conviction based on an alleged error in instructing the jury unless that error was prejudicial. In the case of an *Allen* charge, we look to the text of the instruction, the time that the jury deliberated before and after receiving the charge, and the context in

---

[1]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

which the charge was given, to determine whether the jury was coerced into reaching a guilty verdict. *United States v. Smith*, 635 F.2d 716, 721 (8th Cir. 1980).

We see no evidence of coercion here. Indeed, the fact that the jury deliberated for four hours after the district court gave the *Allen* charge suggests to us that the jurors carefully considered the case. We have held that a verdict returned only forty-five minutes after an *Allen* charge was not coerced. *See Smith*, 635 F.2d at 720-21; *see also United States v. Cook*, 663 F.2d 808, 810-11 (8th Cir. 1981) (*per curiam*) (verdict not coerced when returned at least one hour after charge given).

The Whatleys argue that the verdicts themselves prove coercion because the jury, which had not reached any verdicts at the end of the first day of deliberation, ultimately came to verdicts on all counts after receiving the *Allen* instruction. We find no merit in this argument. The jurors had a total of 113 counts in front of them against four defendants (the Whatleys and two defendants not part of this appeal). They acquitted two defendants and reached a mixed verdict for both Mr. and Mrs. Whatley. Unless we assume that ten hours is not enough time to reach verdicts on that number of counts, which we will not do, there is nothing in this record tending to show that this *Allen* charge coerced the jury into reaching its verdict.

## II.

The Whatleys maintain that because the jury acquitted all of the defendants on the underlying wire fraud counts, there was no scheme to defraud and thus no conspiracy. There are a number of infirmities in this argument, but it is sufficient for present purposes to note that conspiracy is a crime in itself and is punishable whether it succeeds or fails. *See Pereira v. United States*, 347 U.S. 1, 11 (1954). Even if the acquittals to which the Whatleys point are inconsistent with their convictions on the conspiracy charge, there are numerous cases that indicate that a conviction must stand if there is sufficient evidence in the record to sustain it. *See United States v.*

*Pemberton*, 121 F.3d 1157, 1168-69 (8th Cir. 1997). This record is replete with such evidence, as we have already indicated, so there is no error here.

The Whatleys also complain that the jury instructions dealing with the conspiracy charge misstate the law in several important respects. The Whatleys lodged no objections to these instructions in the district court, however, and we therefore review them only for plain error. *See* Fed. R. Crim. P. 30; *see also United States v. Beasley*, 102 F.3d 1440, 1452 (8th Cir. 1996), *cert. denied*, 117 S. Ct. 1856 (1997). Having examined the instructions, we are of the view that they were carefully crafted and tailored to the case. There is certainly nothing plainly erroneous about them, nor can we say that it is likely that any error in them affected the outcome of the case adversely to the Whatleys. *See United States v. Olano*, 507 U.S. 725, 734-35 (1993).

Mrs. Whatley contends that she cannot be convicted of money laundering in violation of 18 U.S.C. § 1957(a), § 1957(d)(1), since she was not convicted of the offense by which she allegedly obtained the money. But the fact that the jury did not convict her on the relevant underlying wire fraud charges does not undermine the money-laundering convictions here. Mrs. Whatley relies principally on *United States v. O'Hagan*, 92 F.3d 612, 628 (8th Cir. 1996), *rev'd on other grounds*, 117 S. Ct. 2199 (1997), for the proposition that a money-laundering conviction cannot stand without a conviction on an underlying offense. But we ruled in that case that as a matter of law the acts that the defendant committed were not illegal and therefore that there was no predicate offense for the money-laundering charge. *Id.* at 613-14, 622, 628. In the present case, by contrast, there is no doubt that the district court properly submitted the wire fraud charges to the jury, because there was sufficient evidence presented at trial that violations of the law had occurred.

The only relevant question when reconciling inconsistent verdicts, as we have already said, is whether there was enough evidence presented to support the conviction. *Nesbitt v. Hopkins*, 86 F.3d 118, 121 (8th Cir. 1996), *cert. denied*, 117 S. Ct. 528

(1996) . Inconsistent verdicts are not, on their own, sufficient grounds for reversal or a new trial. A jury may acquit a defendant as to one or more charges for any number of reasons, including an inclination to be merciful, and yet come to the reasonable conclusion that the defendant was guilty of other related charges. *See United States v. Powell*, 469 U.S. 57, 64-65 (1984).

III.

With respect to their sentences, all of the defendants suggest that the Supreme Court's recent decision in *United States v. Watts*, 117 S. Ct. 633 (1997) (*per curiam*), obligates district courts to make specific findings detailing precisely how acquitted conduct used for sentencing purposes has been proved by a preponderance of the evidence. We disagree. *Watts* holds only that a sentencing court may consider the conduct underlying an acquitted charge "so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 638. The case contains no requirement even that a district court state on the record that its sentencing findings are supported by a preponderance of the evidence, much less that such a court provide a detailed account of all of the facts that underlie these findings. We believe that it is enough if a district court simply makes the factual findings necessary to support the relevant sentencing adjustments.

A district court's factual findings for sentencing must, of course, be supported by evidence sufficient to convince a reasonable fact finder that that evidence preponderates in favor of those findings. We review those findings for clear error and reverse only if we are left with the definite and firm conviction that the district court erred. *United States v. Garrido*, 995 F.2d 808, 812 (8th Cir. 1993), *cert. denied*, 510 U.S. 926 (1993). Here, the district court made such findings on the amount of loss, on whether the defendants misrepresented their operation as a charity, and on whether the victims were unusually vulnerable.

All of the defendants challenge the calculation of the loss occasioned by their fraud, a figure that determines an enhancement to their respective base offense levels under the federal sentencing guidelines. *See* U.S.S.G. § 2F1.1(b)(1). The court's method for calculating the loss must, of course, be a reasonable one, but the loss "need not be determined with precision." *United States v. Berndt*, 86 F.3d 803, 811 (8th Cir. 1996). In this case, the district court calculated the loss by determining MMC's gross revenues, minus the money lost to MMC from refunds and checks on which payment was stopped, the money that MMC spent on prizes, and the money that MMC spent on the "Say No to Drugs" products.

The defendants suggest first that the amount of loss should be reduced by allowances for a reasonable profit and the overhead of running their business, that is, the costs of salaries for employees, of handling of the prizes and the "Say No to Drugs" products, and of shipping those prizes and products. But the district court found that the defendants' business was a conspiracy to commit wire fraud, and we are not inclined to allow the defendants a profit for defrauding people or a credit for money spent perpetuating a fraud.

Mr. Landess and Mr. Barnett suggest that the amount of loss used to fix their sentences should reflect only their own conduct. We held in *United States v. Earles*, 955 F.2d 1175, 1180 (8th Cir. 1992), however, that the amount of loss charged to a particular defendant need not be limited to the money that he or she personally handled. Instead, the amount of loss may include those losses caused by reasonably foreseeable acts that co-workers committed to further the scheme to defraud. *Id.*; *see also United States v. Sandow*, 78 F.3d 388, 392-93 (8th Cir. 1996). There was sufficient evidence in this case for the district court to conclude that co-workers' actions that caused losses were reasonably foreseeable to Mr. Landess and Mr. Barnett and were part of the same conspiracy to commit wire fraud in which they engaged.

Mr. Landess, who worked for the organization for only the first four of the ten months that it operated, challenges the amount of loss that the district court employed to fix his sentence. The district court determined the amount of loss for which Mr. Landess was responsible by taking the total amount of loss caused by the operation, dividing it by the ten months of MMC's operation, and multiplying the result by four. Mr. Landess suggests that this method is unfair, since, he says, the operation probably generated less revenue during its earlier stages. We believe, however, that the district court's method of calculating the loss attributable to him was reasonable. As we have already said, the loss need not be determined with precision. Furthermore, Mr. Landess's actions at the beginning of the operation may have created benefits reaped long after his departure. The district court was in the best position to evaluate these competing concerns, and we will not reject its factual findings unless we think that they are clearly erroneous, which we do not.

Mr. and Mrs. Whatley challenge the district court's findings that the defendants represented falsely that they were acting on behalf of a charity and that they defrauded unusually vulnerable victims. We believe that there was sufficient evidence for the district court to conclude that Mr. and Mrs. Whatley's organization misrepresented that it was acting on behalf of a charity. The telemarketing script indicates that the "Say No to Drugs" products bought by victims of the Whatleys' scheme were going to schools and churches. The script also uses the term "donation" to describe the transfer of funds from the victims to the Whatleys' operation. An enhancement of their sentence for misrepresenting that they were acting on behalf of a charity, in accordance with U.S.S.G. § 2F1.1(b)(3)(A), was therefore proper.

Nor do we see any reason to reverse the district court's imposition of a sentencing enhancement on the basis that the victims in this case were unusually vulnerable. *See* U.S.S.G. § 3A1.1(b). This sentencing enhancement applies when a defendant chooses to target a particular victim or group of victims on the basis of age or of physical or mental condition. *See United States v. Callaway*, 943 F.2d 29, 31 (8th

-10-

Cir. 1991). A reasonable person could conclude on the basis of the evidence presented at trial and at the sentencing hearing that the defendants targeted the elderly and those who were known to be susceptible to the sort of operation that the Whatleys ran. Indeed, one piece of evidence introduced at sentencing indicates that MMC purchased so-called "response leads" that listed customers who would "buy from anyone and everyone that has sales ability," and there was also evidence that Mr. Whatley described these customers as "dupes." We believe, therefore, that this record provided a sufficient basis for the district court's application of the vulnerable-victim enhancement. *See United States v. Jackson*, 95 F.3d 500, 506-08 (7th Cir. 1996), *cert. denied*, 117 S. Ct. 404, 532, 717 (1996).

Finally, Mrs. Whatley appeals the district court's finding as to the total amount of money that she laundered. We conclude, however, that we need not review this finding, as the amount of money laundered does not affect Mrs. Whatley's sentence. The offense level calculated in accordance with the sentencing guidelines for Mrs. Whatley's conspiracy conviction was greater than the offense level calculated for her money-laundering conviction. Under the sentencing guidelines provision for grouping related counts, the higher offense level applies to calculate the sentence for both convictions. *See* U.S.S.G. § 3D1.2(d). Thus, even if we were to find that Mrs. Whatley laundered less money than the district court concluded, Mrs. Whatley's sentencing range would not be affected, and since her sentence was at the very bottom of that range, we conclude that the amount of money that Mrs. Whatley laundered did not affect her sentence in any way.

## IV.

We have considered the other assignments of error advanced by the defendants and find no merit in them. We therefore affirm the judgments of the district court in all respects.

JOHN R. GIBSON, Circuit Judge, concurring.

I concur in the affirmance of the conviction and sentences under appeal and concur in the court's opinion.

I write separately only to underscore that nothing the court says today should be read by district judges as an unqualified approval of the Allen charge given in this case which made no reference to the burden of proof. This was one of the factors that led to a reversal in Potter v. United States, 691 F.2d 1275, 1278 (8th Cir. 1982), although the instruction in Potter had at least three other substantive variations from the Allen charges that have been approved by courts of appeals. As the court recognizes, a general objection to the Allen charge was made, but after the instruction was read omitting the third paragraph, appellants concede that further specific objection was not made. Thus, with respect to the contents of the instruction and the omission of the language concerning burden of proof, the court's review today is only for plain error. The burden of proof was referred to nine times in the instructions given to the jury at the conclusion of the evidence.

The central issue argued by appellant is the coercive effect of the instruction and, as the court holds today, under the record before us there was no coercion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-