# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3754

_____

United States of America

*Plaintiff - Appellee*

v.

Jeffrey Cole Bennett

*Defendant - Appellant*

_____

No. 13-1109

_____

United States of America

*Plaintiff - Appellee*

v.

Jennifer Rose Hogeland

*Defendant - Appellant*

_____

No. 13-2038

_____

United States of America

*Plaintiff - Appellee*

v.

Clayton Craig Hogeland

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: June 10, 2014
Filed: August 29, 2014

_____

Before LOKEN, BEAM, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A jury found Jeffrey Bennett ("Bennett"), Jennifer Hogeland ("Jennifer"), and Clayton Hogeland ("Clayton") guilty on several counts stemming from two fraudulent schemes. The district court[1] sentenced them to ninety-five months', fifteen months', and 200 months' imprisonment, respectively. Bennett and Clayton appeal both their convictions and sentences. Jennifer appeals her convictions. Clayton died while this appeal was pending. For the reasons described below, we vacate Clayton's convictions and remand his case to the district court with instructions to dismiss the indictment as it relates to him. However, we affirm Bennett's convictions and sentence, as well as Jennifer's convictions.

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

# I. Background

Clayton served as general manager of Advantage Transportation, Inc. ("Advantage"), a large Minnesota-based trucking-logistics company. As general manager, Clayton had "free reign" to manage the company's operations, including contracting with outside vendors and approving invoices for payment. At Clayton's recommendation, in May 2003, Advantage hired Bennett to oversee its Memphis, Tennessee office.

Soon thereafter, Clayton and Bennett hatched a scheme to defraud Advantage. Bennett created four corporations: American Logistics Advisors, Inc. ("ALA"); Transportation Marketing Concepts, Inc. ("TMC"); LTLDevelopment.com, Inc. ("LTL"); and Air Catering Solutions and Marketing, Inc. ("ACS"). Between 2003 and 2005, the corporations submitted numerous invoices to Advantage purportedly for various goods or services provided to Advantage. Clayton approved the invoices, after which checks were generated from Advantage to the corporate entities. The checks were then mailed or, on rare occasions, sent by common carrier to the recipients. While Advantage's accounting staff knew that these payments were being made, they were unaware that the corporations were owned by Bennett. Despite receiving the payments from Advantage, Bennett's corporations never actually provided the goods or services for which they had billed Advantage. Bank records for ALA, TMC, and LTL showed that the only payments the corporations had received were from Advantage and that they did not pay ordinary business expenses such as rent or utilities. The only business-expense payments revealed by ACS's bank records were payroll checks to two employees. Instead, Bennett's corporations wrote numerous checks to Jennifer, most of which she deposited into her bank account. Nearly all of the companies' remaining funds were withdrawn by Bennett. In all, Bennett received $393,091 through the fraudulent scheme.

Beginning in 2003, Clayton also operated a separate fraudulent scheme with Carl Frey, an American Airlines employee who was responsible for finding trucking companies to deliver freight for the airline. The two agreed that Frey would steer American Airlines trucking business to Advantage, and, in exchange, Clayton would authorize payments from Advantage to Frey personally. In all, Frey received nearly $90,000. Neither American Airlines nor Advantage were aware of this scheme.

Clayton resigned from Advantage in the spring of 2005, and Bennett left in September 2006. Neither Jennifer nor Clayton informed their tax preparers about the funds obtained through these fraudulent schemes, and thus their illicit income was not included on their joint federal income-tax returns for 2003, 2004, and 2005.

After the fraudulent schemes were discovered, a grand jury returned an indictment against Bennett, Clayton, and Jennifer. The indictment charged Bennett and Clayton with mail fraud, in violation of 18 U.S.C. § 1341; conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371; and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). The indictment also charged Bennett, Clayton, and Jennifer with income-tax evasion, in violation of 26 U.S.C. § 7201. After a joint trial, a jury found Bennett, Clayton, and Jennifer guilty on all counts. Bennett and Clayton appeal both their convictions and their sentences. Jennifer appeals only her convictions.

## II. Discussion

## A. Clayton's Appeal

As noted above, Clayton died while this appeal was pending. Thus, the criminal proceedings against Clayton abated *ab initio*. *See Crooker v. United States*, 325 F.2d 318, 319-20 (8th Cir. 1963). Consistent with our practice in such situations, we vacate his convictions and remand his case to the district court with instructions

-4-

to dismiss the indictment as it pertains to him.  *See United States v. Howe*, 591 F.2d 454, 459 (8th Cir. 1979).

## B. Bennett's Appeal

### 1. Statute of Limitations

Bennett argues that the district court erred by denying his motion to dismiss the mail-fraud and mail-fraud-conspiracy counts on the ground that they are barred by the statute of limitations.  We review the district court's denial of a motion to dismiss an indictment based on the statute of limitations *de novo*.  *United States v. Mueller*, 661 F.3d 338, 344 (8th Cir. 2011).  The five-year statute of limitations prescribed by 18 U.S.C. § 3282 governs both counts.

The indictment alleged that on March 17, 2005, Bennett received a check from Clayton disbursing a fraudulent payment made by Advantage to ACS.  Thus, the check must have been mailed, at the latest, on March 16, 2005.  The indictment was filed on March 17, 2010.  Bennett argues that the limitations period ended on March 16, 2010, five years after the check was mailed to Bennett.

First, the statute of limitations did not bar the mail-fraud charge.  In general, a criminal statute of limitations begins to run "when each element of that offense has occurred."  *United States v. Gonzalez*, 495 F.3d 577, 580 (8th Cir. 2007) (quoting *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999)).  The elements of a mail-fraud offense under 18 U.S.C. § 1341 are: "(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud, (3) reasonable foreseeability that the mail would be used, and (4) that the mail was used in furtherance of some essential step in the scheme."  *United States v. Cole*, 721 F.3d 1016, 1021 (8th Cir. 2013) (quoting *United States v. Louper-Morris*, 672 F.3d 539, 555 (8th Cir. 2012)).  The fourth element can be satisfied by placing an item in the

mail, sending or causing an item to be sent by common carrier, taking or receiving an item from the mail or a common carrier, or knowingly causing an item to be delivered by mail or common carrier. 18 U.S.C. § 1341. Thus, under our general rule, the date on which the statute of limitations begins to run "depend[s] on the specific use of the mails charged in the indictment." *United States v. Crossley*, 224 F.3d 847, 859 (6th Cir. 2000); *see also United States v. Pharis*, 298 F.3d 228, 234 n.3 (3d Cir. 2002). The indictment here alleged that Bennett used the mail by receiving a check from Clayton on March 17, 2005, within five years of the date on which the indictment was filed. Thus, the statute of limitations did not bar the mail-fraud count against Bennett.[2]

However, Bennett argues that our decision in *United States v. Pemberton*, 121 F.3d 1157 (8th Cir. 1997), prescribes that the statute of limitations for mail fraud begins to run only on the date the item was deposited into the mail. In *Pemberton*, we stated that "[f]or mail fraud, the relevant date [for the running of the statute of limitations] is the date of mailing." *Id.* at 1163. Bennett construes the phrase "date of mailing" to mean the date on which the sender deposited the item into the mail, even if the defendant violated § 1341 by using the mail in some other way, such as by receiving the item. Thus, Bennett argues, the statute of limitations began to run on the date the check was mailed to him; that is, on March 16, 2005—more than five years before the indictment against Bennett was filed.

_____

[2]The partial dissent contends that this conclusion conflicts with the views of our sister circuits. We disagree. *United States v. Hoffecker*, 530 F.3d 137, 158 (3d Cir. 2008), on which the partial dissent relies, concerned a situation in which the defendant's charged conduct was sending, not receiving, a mailing and is therefore distinguishable. Moreover, the other cases cited by the partial dissent "are consistent with our holding because we do not believe that the 'date of the mailing' [as discussed in those cases] was intended to have a restrictive meaning, limited to the date on which the relevant matter actually was mailed." *Crossley*, 224 F.3d at 859 (discussing *United States v. Eisen*, 974 F.2d 246, 263 (2d Cir. 1992), and *United States v. Dunn*, 961 F.2d 648, 650 (7th Cir. 1992)).

Bennett misreads *Pemberton* because he decontextualizes our reference to "the date of mailing" from the issue presented in that case. In *Pemberton*, the defendants fraudulently induced an Indian tribe to enter into a series of contracts with them. *Id.* at 1160-61. They argued that the statute of limitations barred their mail-fraud charge because they had fraudulently induced the tribe to enter the contracts more than five years before the indictment against them was filed. *Id.* at 1162-63. However, within the limitations period, the defendants had used the mail to disburse the funds obtained under the contracts. *Id.* at 1162. We rejected the defendants' argument and clarified that a mail-fraud offense is not completed—and the statute of limitations does not begin to run—until the date on which the defendant uses the mail in furtherance of his fraudulent scheme (that is, "the date of mailing" in that case). *See id.* at 1163-64. The limitations period does not begin simply because a fraudulent scheme has been hatched or the fruits of that scheme have been obtained. *See United States v. Eisen*, 974 F.2d 246, 263 (2d Cir. 1992) (cited by *Pemberton*, rejecting argument "that the mail fraud claims date from the time the fraud was conceived"). Because the *Pemberton* defendants had used the mail in furtherance of the fraud within the limitations period, the statute of limitations did not bar the mail-fraud charges. We referred to "the date of mailing" only to emphasize that a defendant's use of the mail—rather than some other aspect of the fraudulent scheme—determines when the limitations period begins. *Pemberton* did not establish an anomalous rule, inconsistent with our general approach to criminal statutes of limitations, under which the limitations period for mail fraud begins before all of the elements of the offense have been completed. In this case, the indictment alleged and the Government proved that Bennett received the check by mail within the limitations period on March 17, 2005. Thus, the statute of limitations did not bar the mail-fraud charge against Bennett. *See Crossley*, 224 F.3d at 859 (holding that statute of limitations did not bar mail-fraud charge where indictment alleged that defendant received mailing within limitations period).

-7-

Similarly, the statute of limitations did not bar the mail-fraud-conspiracy charge. "In a conspiracy charge, the limitations period begins to run from the occurrence of the last overt act committed in furtherance of the conspiracy that is set forth in the indictment." *Mueller*, 661 F.3d at 347 (quoting *United States v. Dolan*, 120 F.3d 856, 864 (8th Cir. 1997)). Bennett's receipt of the check on March 17 was an overt act in furtherance of the mail-fraud conspiracy, one that was integral to carrying on the fraudulent scheme. *See id.* (explaining that the receipt by mail of life-insurance proceeds from policy insuring victim constituted an overt act in furtherance of a conspiracy to commit murder-for-hire). Because this overt act occurred within the limitations period, the statute of limitations did not bar his prosecution for conspiracy to commit mail fraud. Accordingly, the district court did not err by denying Bennett's motion to dismiss the mail-fraud and mail-fraud-conspiracy counts of the indictment.

**2. Sufficiency of the Evidence**

Bennett next argues that the district court erred by denying his motion for a judgment of acquittal on the mail-fraud charge because the Government failed to present sufficient evidence to support the jury's verdict. Specifically, Bennett argues that the evidence did not permit the jury to find that the March 16, 2005 check was mailed to Bennett, that Bennett received the check, or that the mailing was in furtherance of a fraudulent scheme. "We review the denial of a motion for a judgment of acquittal based on the sufficiency of the evidence *de novo*." *United States v. Chatmon*, 742 F.3d 350, 352 (8th Cir. 2014). "We will affirm unless, viewing the evidence in the light most favorable to the Government and accepting all reasonable inferences that may be drawn in favor of the verdict, no reasonable jury could have found [the defendant] guilty." *Id.* (alteration in original) (quoting *United States v. Bynum*, 669 F.3d 880, 883 (8th Cir. 2012)).

The Government presented sufficient evidence to permit the jury to find that the March 16 check was mailed, that Bennett received the check, and that the mailing was in furtherance of a fraudulent scheme. The Government introduced a check from Advantage made payable to ACS and dated March 16, 2005. Diana Goembel, an Advantage accounting manager, testified that it was Advantage's business practice that once a check was signed for an out-of-state vendor, Advantage would then send the check to the vendor by mail or, on rare occasions, by common carrier. The address on the check indicated that it was being sent from Advantage in Minnesota to ACS in Tennessee, and the address was positioned on the check so as to be visible through an envelope's clear-plastic address window. Bennett counters that Goembel was on maternity leave at the time the check was sent and thus that her testimony does not necessarily reflect Advantage's practice at that time. However, no evidence was presented showing that Advantage altered its usual check-mailing practice while Goembel was on maternity leave. Therefore, the jury was permitted to rely on her testimony to find that the check was sent by mail to ACS. *See United States v. Shyres*, 898 F.2d 647, 654-55 (8th Cir. 1990) (holding that a business's "customary procedure for paying invoices" can support a finding that the defendant used the mail to commit mail fraud); *see also United States v. Delfino*, 510 F.3d 468, 471 (4th Cir. 2007) ("[T]he use of the mails can be proven through evidence of business practice or office custom."). From this evidence, the jury reasonably could have concluded that the March 16 check was mailed from Advantage. *See also United States v. Kieffer*, 621 F.3d 825, 832-33 (8th Cir. 2010) (holding that jury could infer that the mails were used because an item was delivered to North Dakota from California).

The Government also presented evidence permitting the jury to conclude reasonably that Bennett received the check. ACS's bank records reveal that a check was deposited in ACS's bank account on March 19, 2005 for the same amount as the check sent from Advantage. Bennett was one of three individuals authorized to deposit funds into the account. He has not pointed to any evidence showing that the other two individuals ever deposited money into the account. This evidence

regarding the deposit of the check permitted the jury to conclude reasonably that Bennett received the check that had been mailed to ACS, which he owned and managed, from Advantage. Bennett argues that the other two individuals authorized to make deposits—rather than he—could have received the check. While the jury perhaps could have reached that conclusion, it did not do so. "The facts and circumstances relied on by the government must be consistent with guilt, but they need not be inconsistent with any other hypothesis . . . ." *Chatmon*, 742 F.3d at 353 (alteration omitted) (quoting *United States v. Lam*, 338 F.3d 868, 872 (8th Cir. 2003)). Thus, the Government presented sufficient evidence to permit the jury to conclude reasonably that Bennett received the March 16 check through the mail.

Finally, the jury could have reasonably concluded that Bennett's receipt of the check was in furtherance of an essential step of the fraudulent scheme. *See Cole*, 721 F.3d at 1021. The Government presented extensive evidence of Clayton and Bennett's multi-year scheme to defraud Advantage. Several Advantage employees testified that, despite exhaustive searches of the company's records, they could find no proof that ACS and Bennett's other companies actually provided any goods or services for which they had billed Advantage. Similarly, no other Advantage employees were aware of any work that Bennett's companies had done for Advantage or goods they had supplied. Goembel testified that she had not known that Bennett owned the companies to which Advantage made numerous payments. The March 16 check was deposited in ACS's bank account, and nearly the entirety of the funds in that account were distributed to Bennett or to Jennifer. From this evidence, the jury could have reasonably concluded that the March 16 check was mailed in furtherance of the scheme to have Advantage pay fraudulent invoices and distribute the proceeds of those invoices to Bennett and Jennifer. Accordingly, the district court did not err in denying Bennett's motion for a judgment of acquittal.[3]

---

[3]Bennett also argues that the Government failed to present sufficient evidence to support his convictions for conspiracy to commit money laundering and conspiracy

### 3. Sixth Amendment

Bennett next argues that the district court violated his Sixth Amendment right to a jury trial by applying several enhancements under the advisory sentencing guidelines based on facts that were not found by the jury. We review a constitutional challenge to a sentence *de novo*. *United States v. Bowers*, 638 F.3d 616, 620 (8th Cir. 2011). Bennett relies primarily on the Supreme Court's recent decision in *Alleyne v. United States*, 133 S.Ct. 2151 (2013). However, under *Alleyne*, the Sixth Amendment permits a district court to rely on facts beyond those found by the jury when the court calculates the applicable advisory sentencing guidelines range and selects a sentence within the statutorily-prescribed range. *United States v. Davis*, --- F.3d ---, 2014 WL 2609715, at *1 (8th Cir. June 12, 2014) (per curiam)*; Alleyne*, 133 S.Ct. at 2161 n.2. Here, the facts found by the district court did not alter the statutory maximum or minimum sentence that Bennett faced. Instead, the district court merely used those facts to calculate the applicable sentencing guidelines range and to exercise its discretion when imposing a sentence within the range prescribed by statute. Thus, the district court did not violate Bennett's Sixth Amendment right to a jury trial.

---

to commit mail fraud. First, he argues that his money-laundering-conspiracy conviction "hinges on finding that . . . [he] committed mail fraud." Even if this assertion were correct, we reject Bennett's argument because, as explained above, the Government presented ample evidence to support his mail-fraud conviction. With regard to his mail-fraud-conspiracy conviction, Bennett argues that the Government failed to prove an overt act in furtherance of the conspiracy because it failed to show that Bennett received the March 16 check. However, as explained above, the Government presented sufficient evidence to permit the jury to conclude that Bennett received the March 16 check, which constitutes an overt act in furtherance of the conspiracy. Thus, we also find Bennett's sufficiency-of-the-evidence challenges to his conspiracy convictions to lack merit.

## 4. Effect of Clayton's Death

Bennett presents three arguments that Clayton's death necessitates reversal of Bennett's convictions and sentence. We find that each of these arguments lacks merit. First, Bennett argues that Clayton's death abated *ab initio* the entire criminal proceeding in this case, thereby invalidating the conviction against Bennett. As noted in Part II.A above, the criminal prosecution against Clayton was abated by his death on appeal. This rule rests on two rationales: first, that a criminal defendant should not be deprived of the right to challenge his conviction on appeal, even by death; and second, that the punitive purposes of a conviction and sentence cannot be served once the defendant has died. *United States v. Wright*, 160 F.3d 905, 908 (2d Cir. 1998). Obviously, neither of these rationales supports abating the criminal proceeding as to a deceased defendant's *living* co-defendants. Thus, we decline to confer upon Bennett the inexplicable windfall that he seeks.

Second, Bennett argues that he has been deprived of the opportunity to rely on the "rule of consistency." Citing *Getsy v. Mitchell*, 495 F.3d 295, 307 (6th Cir. 2007) (en banc), Bennett claims that his conspiracy conviction would be invalidated if Clayton's conspiracy conviction had been invalidated on sufficiency-of-the-evidence grounds. But even if Bennett might have benefitted fortuitously from a favorable outcome in Clayton's appeal, he has no right or entitlement to appellate review of his deceased co-defendant's conviction. He still can challenge—and *has* challenged—the sufficiency of the evidence presented against him. Thus, we can see no reason why Bennett's convictions are undermined by the fact that we no longer will consider Clayton's sufficiency-of-the-evidence argument.

Third, Bennett argues that Clayton's death rendered invalid the district court's application of a role-in-the-offense sentencing enhancement, *see* USSG § 3B1.1(a), which was premised on Bennett's participation in "criminal activity [that] involved five or more participants or was otherwise extensive." Bennett argues that Clayton

cannot be considered for purposes of the enhancement now that he is deceased, thereby reducing the number of participants in the fraudulent scheme to four. However, the guidelines enhancement does not limit its application to participants in the scheme who are living at the time the sentence is reviewed on appeal. Clayton participated in the scheme, and his subsequent death simply does not alter that fact. Nor does Clayton's death affect whether Bennett's fraudulent scheme was "otherwise extensive" when perpetrated, which the presentence investigation report—adopted by the district court—identified as a basis for applying the enhancement to Bennett. Thus, we reject Bennett's challenge to the application of § 3B1.1(a).

## C. Jennifer's Appeal

Jennifer appeals the district court's denial of her motion to sever her trial from that of Clayton and Bennett. She does not argue on appeal that she was misjoined under Federal Rule of Criminal Procedure 8 but rather that the district court erred by denying her request for severance pursuant to Rule 14. Accordingly, we review the district court's denial of her motion to sever for abuse of discretion. *United States v. Mann*, 685 F.3d 714, 718 (8th Cir. 2012). "[T]o warrant severance [under Rule 14] a defendant must show 'real prejudice,' that is, 'something more than the mere fact that he would have had a better chance for acquittal had he been tried separately.'" *United States v. Mickelson*, 378 F.3d 810, 817-18 (8th Cir. 2004) (quoting *United States v. Oakie*, 12 F.3d 1436, 1441 (8th Cir. 1993)). "A defendant can demonstrate real prejudice to his right to a fair trial by showing (a) his defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants." *Id.* at 818.

Jennifer argues that the jury could not be expected to compartmentalize the evidence presented regarding her co-defendants' fraudulent schemes—schemes in which she claims not to have been implicated—when considering her tax-evasion charges. We have explained that "[t]he risk of prejudice posed by joint trials is best

cured by careful and thorough jury instructions." *Mann*, 685 F.3d at 718 (quoting *Mickelson*, 378 F.3d at 818). Here, the district court's final jury instructions admonished the jury: "Keep in mind that you must give separate consideration to the evidence about each individual defendant. Each defendant is entitled to be treated separately, and you must return a separate verdict for each defendant." We have found consistently that such an instruction adequately cured the risk that the jury would not properly compartmentalize the evidence against jointly-tried defendants. *See, e.g.*, *United States v. Mallett*, 751 F.3d 907, 917 (8th Cir. 2014); *Mann*, 685 F.3d at 718. In light of this limiting instruction, we conclude that the district court did not abuse its discretion by denying Jennifer's motion for severance under Rule 14.

We also note that much of the evidence regarding the fraudulent schemes was relevant to the tax-evasion charges against Jennifer. A violation of 26 U.S.C. § 7201 requires "the existence of a tax deficiency." *United States v. Perry*, 714 F.3d 570, 573 (8th Cir. 2013) (quoting *Sansone v. United States*, 380 U.S. 343, 351 (1965)). The existence of a tax deficiency depends, in turn, on whether the income that Jennifer failed to report to the Internal Revenue Service was taxable income. Evidence showing that the income resulted from the fraudulent schemes was necessary to show the source of the income and thus that the income was taxable. Therefore, the admission of evidence regarding the fraudulent schemes did not warrant severing Jennifer's trial from that of Bennett and Clayton. *See United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004) (holding that severance was not required where evidence admitted against co-defendant was independently admitted against defendant seeking severance).

Jennifer also challenges the district court's refusal to provide limiting instructions immediately after several witnesses testified at trial. Her proposed instructions would have informed the jury that it should not consider those witnesses' testimony when considering the charges against her. We review a district court's decision not to give a limiting instruction for abuse of discretion. *United States v.*

*Velazquez-Rivera*, 366 F.3d 661, 666 (8th Cir. 2004). A district court need not instruct the jury regarding each item of evidence at the time the evidence is admitted if the court provides an appropriate instruction at the close of trial. *See United States v. Kime*, 99 F.3d 870, 881 (8th Cir. 1996); *United States v. Garrido*, 995 F.2d 808, 816-17 (8th Cir. 1993). As noted above, the instruction given by the district court at the close of trial adequately instructed the jury to compartmentalize the evidence presented against Clayton and Bennett from the evidence presented against Jennifer. *See Mallett*, 751 F.3d at 917; *Mann*, 685 F.3d at 718. In addition, the instructions specifically identified which defendant was charged with each offense, further reinforcing to the jury that the fraudulent schemes should not be considered improperly when assessing Jennifer's guilt on the tax-evasion charges against her. Thus, the district court did not abuse its discretion by declining to give the limiting instructions requested by Jennifer.

## III. Conclusion

For the foregoing reasons, we vacate Clayton's convictions and remand his case to the district court with instructions to dismiss the indictment as it pertains to him. However, we affirm Bennett's convictions and sentence, as well as Jennifer's convictions.

BEAM, Circuit Judge, concurring and dissenting.

I concur in the judgment of the court except for its affirmance of the mail fraud conviction. The limitations period on the mail fraud conspiracy did not begin to run until the last overt act in furtherance of the conspiracy had occurred, United States v. Dolan, 120 F.3d 856, 864 (8th Cir. 1997), which act was, of course, subsequent to March 16, 2005. The limitations period for the mail fraud charge itself, however, commenced on March 16, 2005, the date the last check was placed in the mail. United States v. Pemberton, 121 F.3d 1157, 1163 (8th Cir. 1997). Since all of the

-15-

charges at issue in this prosecution were initiated when the indictment was filed on March 17, 2010, the mail fraud charge must be dismissed as untimely.

The court contends that Bennett's argument concerning the importance of the mailing date of the check "decontextualizes" this court's reference to such happening in Pemberton. I disagree.

The district court, at the government's urging, adopted the Sixth Circuit's ambiguous reasoning in United States v. Crossley, 224 F.3d 847, 859 (6th Cir. 2000), only barely acknowledging Pemberton which clearly states "[f]or mail fraud, the relevant date [for the statute of limitations] is the date of the mailing." 121 F.3d at 1163. And, the Second, Third and Seventh Circuits each agree with this analysis. United States v. Eisen, 974 F.2d 246, 263 (2d Cir. 1992); United States v. Hoffecker, 530 F.3d 137, 157-58 (3d Cir. 2008); United States v. Dunn, 961 F.2d 648, 650 (7th Cir. 1992). So, it seems, decontextualization, if any has occurred, runs in the direction of the Sixth Circuit and the district court and not the precedent established in Pemberton.

Accordingly, I would reverse the district court's holding to the contrary and remand this matter for resentencing of Bennett without consideration of the mail fraud charge.

———————————————————