# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3103

_____

United States of America

*Plaintiff - Appellee*

v.

Andrew Thurman Melton

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: March 10, 2017
Filed: August 31, 2017

_____

Before RILEY,[1] Chief Judge, GRUENDER, Circuit Judge, and SCHREIER,[2] District Judge.

_____

RILEY, Chief Judge.

_____

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

[2]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota, sitting by designation.

A jury found Andrew Melton guilty of twelve counts of mail fraud and five counts of failure to pay employment taxes. See 18 U.S.C § 1341; 26 U.S.C. § 7202. The district court[3] sentenced Melton to seven years in prison. Melton appeals his convictions and sentence. We affirm. See 28 U.S.C. § 1291 (appellate jurisdiction).

## I.    BACKGROUND
### A.    Factual History
#### 1.    Mail Fraud and Payroll Tax Schemes

In 1998, an Arkansas state court issued a $73,000 judgment against Melton for his failure to pay an interior design firm for its work on his home in Little Rock. Some time after, Melton moved to Texas, having made no payments on the judgment. In September 2005, Melton became chief financial officer of ThermoEnergy Corporation, a publicly traded corporation headquartered in Little Rock, focused on licensing clean water technologies and water purification systems. Gary Mertins, the designer whom Melton had shorted, received word Melton was back in Arkansas and asked his brother and attorney, William Mertins, to help him collect the 1998 judgment. William Mertins filed a writ of garnishment regarding the 1998 judgment, which at the time had grown to over $127,000 with interest.

In July 2006, two Pulaski County, Arkansas, sheriff deputies arrived at ThermoEnergy with a writ of execution for the garnishment of Melton's wages. Melton was not in the office, and instead, the garnishment was served on David Cossey, ThermoEnergy's chief executive officer. Cossey later approached Melton about the garnishment, and Melton told Cossey he would "take care of it." Cossey assumed this meant Melton would deduct the payments toward the garnishment from his paycheck because, as chief financial officer, Melton controlled ThermoEnergy's budget and payroll. Not long after, Mertins Law Firm began receiving checks for

---

[3]The Honorable Billy Roy Wilson, United States District Judge for the Eastern District of Arkansas.

approximately $3,000 each month in service of Melton's garnishment.[4] Cossey and Melton did not discuss the garnishment again until 2009.

In addition to managing ThermoEnergy's payroll, Melton was responsible for "oversee[ing] all [the company's] financial operations" and collecting, accounting for, and filing federal and state taxes related to payroll. In December 2008, an outside auditor from an accounting firm was conducting an annual audit when he noticed ThermoEnergy's payroll tax liability was much higher than in the years 2005, 2006, and 2007. The auditor, Michael Barron, sent ThermoEnergy's controller, Shelley Cline, an email about the liability. Cline sent Barron the details of the monthly entries into ThermoEnergy's payroll liability account. Over the next three months, Barron worked with Cline as he tried, and failed, to obtain necessary documentation from ThermoEnergy. With an audit deadline approaching, Barron eventually reached out to Melton directly on two separate occasions.

On April 6, 2009, Barron sent Melton an email concerning the payroll tax liability. To complete his audit, Barron needed some kind of documentation from the Internal Revenue Service (IRS), and he was becoming concerned about potential penalties and fines. On April 14, 2009, the day before the deadline for late filing with the Securities Exchange Commission, Melton sent Barron a memorandum. The memorandum represented that Melton had been in "several discussions with the IRS" and was negotiating a payment plan to become current with the payroll tax liability.

At some point around April 15, Barron and his boss Bill Kemp went to ThermoEnergy's office. Barron, Kemp, Cossey, ThermoEnergy attorney Gary Barket, and Melton met to address the payroll tax liability. Melton was asked to provide copies of IRS Forms 940 and 941, the forms used for filing payroll taxes, to verify he had paid and filed ThermoEnergy's payroll taxes. Throughout the meeting,

---

[4]The checks were sent by mail or by overnight FedEx or UPS.

Melton left and returned with a series of purported IRS forms that Melton claimed he had filed during the years 2006, 2007, 2008, and 2009. The documents, all signed and dated, were printed on forms that had the year 2009 scratched off in the upper corner. According to Barron, it was "very apparent" Melton was completing the forms "right then." On May 21, Barron sent Melton an email asking why he could not find corresponding documentation in ThermoEnergy's account for an alleged payroll tax payment. Melton responded and told Barron, "I gave you the wrong copy, there was no payment, I have correct copies for you."

On May 28, 2009, ThermoEnergy's board of directors held an emergency meeting to address the payroll tax liability. The board authorized hiring an outside forensic auditing firm to investigate further and assess ThermoEnergy's potential civil and criminal liabilities. Over the next two months, the board entered into a series of resolutions limiting Melton's duties and authority, which included removing him from company accounts.

Also on May 28, 2009, Barron was at ThermoEnergy working on the audit when he discovered a check for $9,350 issued to Mertins Law Firm. Barron scanned through the prior year's audit and found eleven payments for $3,102.80 each made to Mertins Law Firm. One of the checks was marked "garnishment." Barron asked Cossey about the payments, and Cossey told Barron about the garnishment on Melton's wages. Barron looked into Melton's payroll records, but found no indication of a garnishment. Barron discovered these routine payments to Mertins Law Firm were being classified as a legal expense of ThermoEnergy's. The board of directors ultimately ordered Melton to resign from ThermoEnergy by August 3, 2009.

### 2. Forensic Audit and Federal Investigation

ThermoEnergy enlisted certified public accountant Jeffrey Roberts to conduct a forensic audit investigation. On June 26, 2009, Roberts interviewed Melton. Melton told Roberts he had filed ThermoEnergy's payroll taxes "just maybe a month

or two after their actual due dates." Melton informed Roberts that ThermoEnergy had a cash flow problem, and ThermoEnergy "had been dancing around it for years with the IRS and they didn't keep the notices they were sending." Roberts asked why Melton could not find documentation indicating the taxes had been filed with the IRS, and Melton speculated the forms had been misplaced because ThermoEnergy had recently moved office locations. Roberts also asked Melton about money Melton had taken from ThermoEnergy, such as checks Melton wrote made payable to cash, personal charges Melton made to his company credit card, and extensive travel charged to ThermoEnergy. Melton claimed he had paid for company expenses out of his own pocket, and the disbursements to himself were reimbursements for those charges, but Melton did not provide receipts or documentation of those alleged business-related expenses paid by him personally.

In February 2011, the Federal Bureau of Investigation (FBI) received information prompting an investigation into Melton. In January and October 2012, FBI Special Agent Shaun Roth and IRS Special Agent Erica Williams conducted interviews with Melton. Melton alleged he had spent $800,000 of his own money to pay for ThermoEnergy-related expenses, and ThermoEnergy still owed him approximately $150,000 in reimbursement for those expenses. Melton said he would provide receipts and documentation of his expenses, but never did.

As for the payroll tax liability, Melton alleged Cossey, Cline, and a member of the ThermoEnergy board knew payroll taxes were not being paid. During the first interview, Melton claimed he had met with a representative from the IRS at the federal building in Little Rock, but during his second interview he admitted this was untrue, and he had never spoken with anyone from the IRS. When the agents confronted Melton with the memorandum he had sent Barron stating he had been negotiating with the IRS, Melton admitted he created the document so Barron could complete his audit. Melton also told the agents that the Forms 940 and 941 he had given Barron were printed on forms created in 2009 only because he had not saved

the originals. The agents inquired about entries made into ThermoEnergy's ledgers so it appeared as if ThermoEnergy had made payroll tax payments, but Melton stated he could not recall making such entries.

### B.    Prior Proceedings

In February 2013, a federal grand jury charged Melton with twelve counts of mail fraud, each count based on a separate check written to Mertins Law Firm in 2008 and 2009. In April 2014, the grand jury returned a superseding indictment adding five counts of failure to pay withholding taxes. See 18 U.S.C. § 1341; 26 U.S.C. § 7202. Melton pled not guilty.

At trial, the government explained it intended to prove (1) Melton fraudulently took ThermoEnergy's money to pay his personal debt, and (2) Melton willfully failed to pay ThermoEnergy's payroll taxes in 2008 and the first quarter of 2009. The government called Cossey, Barron, Roberts, Special Agent Roth, and Special Agent Williams, among others. Cossey testified he did not approve Melton paying his personal debt with ThermoEnergy funds and stated he did not know the payroll taxes were unpaid until the audit revealed as much. Over Melton's objections, the district court received into evidence minutes from ThermoEnergy's board meetings; emails among Barron, Cline, Melton, and Cossey; Barron's audit report; and Roberts' forensic audit report. At the close of the government's case, Melton moved for judgment of acquittal, which the district court denied.

Melton testified in his defense. Melton admitted the payroll taxes were not paid on time. Melton claimed ThermoEnergy owed him money because, due to the company's cash flow problem, he was forced to pay employees out of his own pocket, and so he would in turn "get cash back from the company when we had cash available." Melton acknowledged it was improper to pay his personal debt with money taken from ThermoEnergy's legal expense account, but claimed he did so because ThermoEnergy had not reimbursed him for about 75 trips he had taken from

Dallas to Little Rock before he permanently moved back to Little Rock, and he "didn't do it properly" because he "was so busy." Melton stated he recorded each of those distributions to Mertins Law Firm and "wasn't trying to hide anything."

At the close of the evidence, Melton renewed his motion for judgment of acquittal, which was again denied. The jury returned a guilty verdict on all seventeen counts.

For sentencing, the district court adopted the findings in Melton's presentence investigation report. The district court applied a two-level enhancement for the use of sophisticated means, a four-level enhancement because Melton's crimes endangered the solvency of a publicly traded company, a two-level enhancement because Melton held a position of public trust, and a two-level enhancement for obstruction of justice. See United States Sentencing Guidelines (U.S.S.G. or Guidelines) §§ 2B1.1(b)(1)(I), 2B1.1(b)(10)(C), 2B1.1(b)(16)(B)(ii)(I), 3B1.3, 3C1.1.[5] The district court determined Melton's advisory sentencing range under the Guidelines was 135-168 months. The government agreed a seven-year sentence was reasonable, and the district court sentenced Melton to 84 months on the mail fraud counts and 60 months on the failure to pay withholding tax counts, to run concurrently.

## II. DISCUSSION

### A. Evidentiary Rulings

Melton argues the district court abused its discretion by admitting into evidence the following: (1) minutes from three emergency board meetings during 2009, (2) emails among Cline, Barron, Melton, and Cossey, and (3) audit and forensic audit

---

[5]The presentence investigation report used the 2008 version of the Guidelines. Neither party contests this point. We cite to the 2016 version because there is no material difference between the versions.

reports. We review the district court's admission of evidence for an abuse of discretion, affording "'deference to the district judge who saw and heard the evidence.'" United States v. Two Elk, 536 F.3d 890, 900 (8th Cir. 2008) (quoting United States v. Davidson, 449 F.3d 849, 853 (8th Cir. 2006)). "An evidentiary ruling is harmless if the substantial rights of the defendant were unaffected, and the error had no, or only a slight, influence on the verdict." United States v. Worman, 622 F.3d 969, 976 (8th Cir. 2010).

### 1. Board Meeting Minutes

During Cossey's direct examination, the government introduced the minutes from ThermoEnergy's emergency board meetings on May 28, June 5, and July 31, 2009. As foundation, Cossey testified it was a regular practice of ThermoEnergy to keep minutes taken at meetings of the board of directors, and the minutes were prepared by ThermoEnergy's outside corporate counsel. Cossey verified the minutes were correct and accurate based on his personal recollection. The government moved to admit the first set of minutes, and Melton objected, arguing the evidence "invade[d] the province of the jury by saying that they've uncovered evidence of illegal acts on the part of Mr. Melton." The May 28 and June 5 minutes both stated the accounting firm had discovered evidence of disbursements that may have been "illegal acts on the part of . . . Melton," and the July 31 minutes stated Melton "has committed material violations of law."

The government offered to redact references to legal conclusions but maintained the exhibits were admissible under the business-records exception to hearsay. See Fed. R. Evid. 803(6). The district court dismissed the jury and heard further argument from the parties. The government again asserted the exhibits were admissible, to which the district court responded, "No doubt about it being part of a business record, but . . . there could be all kinds of things in a business record that's admissible, but there's some inadmissible portions of it." The district court decided the evidence was "probably admissible," and asked Melton's counsel if he would like

a limiting instruction to be given to the jury. Melton's counsel requested a limiting instruction, but did not ask for any redactions, and again argued the evidence should not be admitted because it contained prejudicial conclusions of law. The district court overruled the objection, assumed the parties held similar positions in regard to the other two sets of minutes, and ruled these exhibits admissible as well. Before publishing the first exhibit, the district court gave the following limiting instruction to the jury:

> [Exhibit] Number 9, ladies and gentlemen of the jury, will have some potential findings that there might have been violations of the law. That does not mean that there were violations of the law. You'll decide whether there were violations of the law based on the specific indictment that's brought here for you to consider. This shows what was brought to the attention of the Board and will explain in part some action they have taken.

Though the district court did not repeat the instruction before publishing the next two exhibits, it referred the jury to the "[s]ame admonition with the alleged violations that may be mentioned in the exhibit." The minutes were not redacted in any way.

Melton argues, even if these minutes were admissible under the business-records exception to hearsay, the references to illegal acts were unduly prejudicial. See Fed. R. Evid. 403. We agree the minutes were admissible business records, but share Melton's concern regarding their prejudicial effect. Yet, we "give[] broad deference to a district court's determination under Rule 403," and we "'do not reweigh the value of the material against its potential for harm to the defendant, but determine only whether the district judge abused its discretion in admitting it.'" United States v. Loveless, 139 F.3d 587, 592 (8th Cir. 1998) (quoting United States v. Holmes, 822 F.2d 802, 806 (8th Cir. 1987)). The brief references to illegal conduct were only in a few sentences of the total nine pages of these three exhibits, and the

minutes contained relevant specific information regarding the actions and resolutions of ThermoEnergy's board of directors.

Importantly, although the government offered to redact those challenged references, the record shows Melton did not pursue the government's offer to redact the references to illegal conduct. Without acceptance of the redaction, the district court provided a sufficient limiting instruction to the jury. See United States v. Walker, 470 F.3d 1271, 1275 (8th Cir. 2006) ("[A] limiting instruction diminishes the danger of unfair prejudice arising from the admission of the evidence."); see also Loveless, 139 F.3d at 593. The district court did not abuse its discretion.

### 2.     Emails

Melton next argues four emails contained inadmissible hearsay. The first email was from Barron to Cline, in late December 2008 following Barron's discovery of the sizeable payroll tax liability, asking Cline to provide details of the payroll tax liability account. Melton objected to the email's admission as hearsay. The government withdrew its request for admission of the exhibit, explaining it would instead ask Barron about its contents because Barron was presently under examination. The second email was Cline's response to Barron. Over another hearsay objection, the district court admitted the email because the government proffered Cline would later testify about the emails' content. Barron read part of the exhibit, stating the email indicated Cline had "ask[ed] [Melton] about [the payroll liability] and he said that he will pay it by the end of the year" and included an attachment of a payroll record. The government only referred to the third and fourth emails in its examination of Barron and did not offer them into evidence. The third email was from Barron to Melton and Cline and listed items Barron needed from Melton to complete his audit. The fourth email, from Barron to Melton and Cossey, had the subject line "Possible Illegal Acts" and contained an attached memorandum summarizing the issues discovered during Barron's audit.

During the next recess, the district court discussed the objections with the parties outside the presence of the jury. The government moved to withdraw the first email from Barron to Cline and the second email from Cline to Barron, and the district court struck them from the record. The district court then stated it was "going to reverse [itself] again" on the emails from Barron to Melton and Cline and from Barron to Cline and Cossey, considering them "admitted." The government then formally offered into evidence these emails, to which the district court responded, "I'm going to leave them in."

It is unclear to us which of these emails remained in evidence. It is clear to us, however, regardless of whether the emails constituted inadmissable hearsay, their combined significance was minor. "An error admitting hearsay testimony 'that does not affect substantial rights must be disregarded.'" United States v. Tenerelli, 614 F.3d 764, 771 (8th Cir. 2010) (quoting Fed. R. Crim. P. 52(a)). These emails were inconsequential in the overall trial and did not affect the verdict. See Worman, 622 F.3d at 976.

### 3.    Audit Reports

During the government's re-examination of Barron, he discussed a report he completed for ThermoEnergy's board of directors on September 30, 2009. The report communicated the results of the 2008 audit, which recommended diversifying Melton's duties as chief financial officer because the "lack of segregation of duties in this area allowed [Melton] to make unauthorized disbursements for personal expenses and to pay a garnishment order with Company funds payable to a law firm instead of deducting the funds from his net pay." Barron testified the report was "the required communication letter to the audit committee of the Board of Directors required by the CPA reporting standards to be issued annually after an audit of a corporation." Melton objected, arguing, "This would have been done after Mr. Melton left the company." The district court admitted the report.

-11-

"'To preserve an error for appellate review, an objection must be timely and must clearly stat[e] the grounds for the objection. Errors not properly preserved are reviewed only for plain error.'" United States v. Price, 851 F.3d 824, 826 (8th Cir. 2017) (per curiam) (alteration in original) (quoting United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005) (en banc)). Because's Melton's trial objection failed to state clear grounds, we review for plain error. See Fed. R. Crim. P. 52(b); Pirani, 406 F.3d at 549.

The fact that Barron discovered significant irregularities does not render the report inadmissible under Fed. R. Evid. 803(6). See Cullen v. United States, 408 F.2d 1178, 1179-80 (8th Cir. 1969) (concluding audit records calculating amounts lost after a bank robbery were admissible because the fact that "such recording may occur after an unusual event such as a bank robbery does not alter the fact that the records were prepared in a regular manner"). But see Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1258-59 (9th Cir. 1984) (holding audit reports generated only after a suspected deficiency were not prepared in the course of regularly conducted business). As Barron explained, he prepared the report as part of his annual audit duties for ThermoEnergy. Any resulting prejudice arising from its conclusions and recommendations did not affect Melton's substantial rights because Barron had already explained the results of his audit in his testimony—specifically, by expressing to the jury his concern that Melton was violating the law. See Fed. R. Evid. 403.

More concerning was the admission of Roberts' audit report which he prepared for the board of directors. The report contained an executive summary of the investigation into Melton's credit card charges to ThermoEnergy, expense reimbursements to himself, payments made toward his personal garnishment, and failure to file and pay ThermoEnergy's payroll taxes. Melton objected on the grounds of hearsay. The district court overruled Melton's objection and admitted the report. Melton contends the report fell outside the business-records exception to hearsay because it was prepared to determine the extent of ThermoEnergy's liability in

-12-

anticipation of litigation. We agree the report should not have been admitted under Fed. R. Evid. 803(6). The report was not a record of a regularly conducted activity, because it was created for the purpose of determining the legal implications of Melton's conduct.

Nonetheless, we conclude the district court's abuse of discretion did not result in reversible error. Although the report itself contained Roberts' written conclusions, his testimony at trial relayed his conversations with Melton during his investigation, and the report summarizing his testimony was cumulative. "'Improper admission of evidence which is cumulative of matters shown by admissible evidence is harmless error.'" Davis v. White, 858 F.3d 1155, 1159 (8th Cir. 2017) (quoting Wilson v. City of Des Moines, 442 F.3d 637, 644 (8th Cir. 2006)); see also United States v. Londondio, 420 F.3d 777, 789 (8th Cir. 2005) ("The admission of hearsay evidence that is cumulative of earlier trial testimony by the declarant . . . is not likely to influence the jury and is therefore harmless error."). Melton's substantial rights were not affected by the report's admission.

## B.     Government's Closing Argument

Melton asserts a new trial should be granted because the government's remarks during closing affected his right to a fair trial. Because Melton did not object on those grounds during trial, we review for plain error. See United States v. White, 241 F.3d 1015, 1023 (8th Cir. 2001). The burden is on Melton to demonstrate the district court plainly erred by allowing the government's comments. See id. "We will reverse an improper remark during closing argument without an objection only under 'exceptional circumstances.'" United States v. Branch, 591 F.3d 602, 609 (8th Cir. 2009) (quoting United States v. Eldridge, 984 F.2d 943, 947 (8th Cir. 1993)). Reversal for prosecutorial misconduct requires proof that "'the prosecutor's remarks were improper,'" and "'such remarks prejudiced the defendant's rights in obtaining a fair trial.'" Id. (quoting United States v. Bentley, 561 F.3d 803, 809 (8th Cir. 2009)).

-13-

Melton calls our attention to several statements made during closing. Referring to Melton's testimony, counsel for the government remarked, "His lips are moving, things are going through his brain coming out his mouth and it's just flat out lies. That pretty much typifies Mr. Melton." Counsel repeated he believed Melton was lying, and Melton was selling "magic" on the stand. Counsel also called Melton's testimony "silly" and "made up," and remarked, "there is just arrogance flowing from that man [Melton] right there." Near the end of his closing, counsel concluded: "The evidence is Andrew Melton is lying. . . . It's amazing what that man got up there and testified about and lied to you. . . . That man right there is guilty. Convict him."

While these comments taken together and out of context arguably may be inappropriate for a federal government prosecutor, we liken their effect to those discussed in United States v. White, where we determined the prosecutor's comments were "questionable," but did "not rise to the level of plain error affecting [the defendant's] substantial rights." White, 241 F.3d at 1023. In White, under plain error review, the defendant challenged the prosecutor's statements that the defendant was "'lying bold face to you,'" and "'tried to lie to you,'" by suggesting he had not used drugs for several decades. Id. at 1022-23. The prosecutor also stated, "'If he can suggest to the government that witnesses are willing to lie, what kind of lies do you think he would tell in order to evade responsibility entirely?'" Id. at 1023. We determined the comments did not warrant reversal because the prosecutor "outlined the evidence and highlighted the reasons he believed [the defendant's] testimony was not credible," and "we [chose] not to employ the discretion conferred by Rule 52(b)" because it was not "a miscarriage of justice." Id. (citation omitted); see also Fed. R. Crim. P. 52(b). We reasoned it was "permissible for a prosecutor to interpret the evidence as indicating that the defendant [was] not telling the truth." Id. "So long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they, no less than defense counsel, are free to use colorful and forceful language in their arguments to the jury." United States v. Robinson, 110

F.3d 1320, 1327 (8th Cir.1997); cf. United States v. Holmes, 413 F.3d 770, 775 (8th Cir. 2005) (holding the prosecutor's closing comments implying defense counsel was "conspiring with the defendant to fabricate testimony" were "highly improper because they improperly encourage the jury to focus on the conduct and role of [the defendant's] attorney rather than on the evidence of [the defendant's] guilt"); United States v. Johnson, 968 F.2d 768, 772 (8th Cir. 1992) (granting a new trial where closing remarks improperly ignited "fear and concern engendered by the national drug epidemic").

Here, the government's case hinged on whether the jury believed Melton's defense. Once the payroll tax liability was discovered, Melton told a series of stories in an attempt to keep up appearances. At their core, the challenged prosecution comments attacked Melton's testimony, a fair topic for closing remarks. See United States v. Frokjer, 415 F.3d 865, 874 (8th Cir. 2005) (holding "there is nothing wrong with the prosecutor arguing that the evidence proved that [the defendant] was lying" where the charge involved making false statements). Any error in the government's statements was not a miscarriage of justice. The evidence of guilt was "'overwhelming,'" and therefore "'an improper argument is less likely to affect the jury verdict.'" United States v. Barrera, 628 F.3d 1004, 1008 (8th Cir. 2011) (quoting Johnson, 968 F.2d at 772). We do not exercise our Rule 52(b) discretion to recognize any plain error.

### C.     Motion for Judgment of Acquittal

Melton appeals the district court's denial of his motion for judgment of acquittal on the mail fraud counts. We review de novo whether the evidence was sufficient to sustain the convictions. See United States v. Bennett, 765 F.3d 887, 895 (8th Cir. 2014). "'Evidence is sufficient to sustain a conviction if, when viewed in the light most favorable to the government, it offers substantial support for the verdict.'" United States v. McKanry, 628 F.3d 1010, 1016 (8th Cir. 2011) (quoting United States v. Clay, 618 F.3d 946, 950 (8th Cir. 2010) (per curiam)). Viewing the

evidence in the light most favorable to the government, and accepting reasonable inferences in favor of the jury's verdict, we will affirm unless "'no reasonable jury could have found [the defendant] guilty.'" Bennett, 765 F.3d at 895 (alteration in original) (quoting United States v. Chatmon, 742 F.3d 350, 352 (8th Cir. 2014)).

The crime of mail fraud essentially contains four elements: (1) a scheme to defraud through false representations, (2) intent to defraud, (3) reasonable foreseeability the mail would be used, and (4) the mail was actually used. See United States v. Bryant, 606 F.3d 912, 917 (8th Cir. 2010); see also United States v. Easton, 54 F. App'x 242, 243 (8th Cir. 2002) (unpublished per curiam).

Melton contends the evidence was insufficient to support his mail fraud convictions because the payments he made to satisfy his personal debt were not a fraudulent scheme and the government did not prove he intended to defraud ThermoEnergy. As chief financial officer, Melton was entrusted with complete responsibility of ThermoEnergy's finances and payroll. Rather than deduct the garnishment payments from his personal salary and apply them toward his personal debt, as Melton admitted he knew he should do, Melton directly diverted funds from ThermoEnergy's legal expense account for his personal benefit, knowing he possessed sole control over the financial operations.

Melton argues it was "lack of diligence" on the part of the ThermoEnergy, its audit committee, and its public accounting firm—"not [his own] deliberate deceit"—that "caused the payments to Mertins Law Firm to go unnoticed." Melton testified ThermoEnergy's annual legal expenses were usually between $350,000 and $600,000, and the comparative amount of each garnishment check was "minor." The jury could have inferred Melton knew the relatively small garnishment payments between $3,000 and $9,000 would go unnoticed among the auditors. The payroll set up between Melton and Cline, whom Melton hired in 2006, also supports the inference Melton intended to keep the payments to Mertins Law Firm hidden. Melton

-16-

maintained an older version of QuickBooks, the accounting software he and Cline used, so they could not share documents electronically. Instead, Melton would print physical copies of records and give them to Cline to enter manually into her version of the accounting software, and Cline could not verify the information from Melton. Only Melton's version of QuickBooks had a "payroll module" activated, so Cline had no ability to print company checks. Although Melton contends ThermoEnergy owed him "in excess of a couple hundred thousand dollars for unpaid salary, deferred compensation, and unreimbursed expenses," the jury was free to discredit Melton's testimony and conclude he intentionally defrauded ThermoEnergy. See United States v. Louper-Morris, 672 F.3d 539, 556 (8th Cir. 2012) ("'Fraudulent intent need not be proved directly and can be inferred from the facts and circumstances surrounding a defendant's actions.'" (quoting United States v. Flynn, 196 F.3d 927, 929 (8th Cir. 1999))). Melton's unauthorized actions demonstrate a pattern designed to conceal his use of company funds to pay his personal debt.

### D. Right to a Fair Trial

Melton argues the cumulative effects of these errors deprived him of his constitutional right to a fair trial. "We may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." United States v. Mann, 701 F.3d 274, 311 (8th Cir. 2012) (citation omitted). "This court will not reverse based upon the cumulative effect of errors unless there is substantial prejudice to the defendant." United States v. Anwar, 428 F.3d 1102, 1115 (8th Cir. 2005). The cumulative effect of any errors here did not substantially affect Melton's right to a fair trial, and we will not reverse on that basis.

### E. Sentence Enhancements

Melton challenges his seven-year sentence, arguing the district court committed procedural error by applying three specific offense enhancements. "'[W]e review a district court's factual findings for clear error and its interpretation and application

-17-

of the guidelines de novo.'" United States v. Timberlake, 679 F.3d 1008, 1011 (8th Cir. 2012) (quoting Bryant, 606 F.3d at 918). "We also note that 'sentencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence.'" United States v. Norwood, 774 F.3d 476, 479 (8th Cir. 2014) (per curiam) (quoting United States v. Scott, 448 F.3d 1040, 1043 (8th Cir. 2006)).

### 1.     Sophisticated Means

The district court applied a two-level enhancement to Melton's offense level for the use of sophisticated means. See U.S.S.G. § 2B1.1(b)(10)(C). The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. cmt. n.9(B). "The sophisticated-means enhancement is proper when the offense conduct, viewed as a whole, 'was notably more intricate than that of the garden-variety [offense].'" United States v. Jenkins, 578 F.3d 745, 751 (8th Cir. 2009) (alteration in original) (quoting United States v. Hance, 501 F.3d 900, 909 (8th Cir. 2007)). "'Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme.'" Id. (quoting United States v. Finck, 407 F.3d 908, 915 (8th Cir. 2005)).

The district court did not clearly err by finding Melton employed sophisticated means. To conceal ThermoEnergy's payroll tax liability, Melton made false entries into ThermoEnergy's ledgers and kept Cline from accessing the data by maintaining a different version of their accounting software. After Barron discovered the payroll tax liability, Melton attempted to conceal his scheme further by writing a memorandum to Barron falsely informing him he was working with the IRS, and then presenting doctored IRS Forms to Barron and Cossey alleging he had paid the taxes. Melton's mail fraud scheme also was sophisticated because Melton's conduct, which lasted over a period of four years, was repetitive and coordinated. Abusing his authority as chief financial officer, Melton concealed the garnishment payments. Melton recorded the payments in ThermoEnergy's ledger yet acknowledged they

were comparatively minor, and thus likely would go undetected. Melton consistently mischaracterized the payments in a way he suspected would remain unnoticed.

### 2. Endangerment of Financial Security

The district court also applied a four-level sentence enhancement because it found Melton's crimes "substantially endangered the solvency or financial security of an organization that, at any time during the offense, was a publicly traded company." U.S.S.G. § 2B1.1(b)(16)(B)(ii)(I). Melton claims ThermoEnergy's financial hardship was not a result of his own conduct because almost every witness testified ThermoEnergy constantly had revenue problems.

According to Cline, payroll checks frequently bounced, and ThermoEnergy went without paying executives for several months because ThermoEnergy needed funding from potential investors. While the government agrees there "[c]ertainly" were other factors affecting the financial security of ThermoEnergy, Melton's crimes left ThermoEnergy with an "unforeseen $2,000,000 liability, and the public effects of a crooked CFO on [ThermoEnergy's] reputation." Cossey, who retired from ThermoEnergy in 2011, stated that to his knowledge ThermoEnergy now operated only as a "virtual company" with no employees. Arthur Reynolds, who was interim chief executive officer of ThermoEnergy from August 3, 2009 until November 2010, testified, "key investors were not willing to put more money in until [the payroll tax liability] matter was clarified and resolved." Though Melton was not solely responsible for ThermoEnergy's financial hardship, given the effect of his crimes on the security and future of the organization, the district court did not err in applying this enhancement. See United States v. Wheeler, 412 F.3d 979, 981 (8th Cir. 2005) (upholding the application of an enhancement for endangering the financial security of a corporation where the defendant's conduct "adversely affected the company's viability, profitability, and ability to staff the business" and nearly forced the corporation into bankruptcy (internal quotation marks omitted)).

### 3. Obstruction of Justice

Lastly, Melton challenges the district court's finding that he obstructed justice under U.S.S.G. § 3C1.1. The district court may apply a two-level sentence enhancement for obstruction of justice if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." Id. One of the ways in which a defendant obstructs justice is by "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." Id. cmt. n.4(G).

Melton argues the government "did not meet its burden of proof" because it "did not assert, nor was it proven, that the statements provided by Mr. Melton were material and they significantly obstructed or impeded the official investigation or prosecution of the case." The evidence demonstrates otherwise. On two separate occasions, Melton spoke with Special Agent Roth and Special Agent Williams. In each interview, Melton obfuscated the truth, forcing the agents to expend additional time and resources investigating Melton's statements. Melton told the agents he had met with an individual from the IRS, which he later admitted was untrue. Melton advised the agents Cossey knew the payroll taxes were not being paid, but Cossey denied that allegation at trial. Melton said he would provide the agents with documentation of his expenses for ThermoEnergy, but never did. Melton claimed he did not remember making any false entries in ThermoEnergy's ledgers to make the ledgers appear as if ThermoEnergy had paid its taxes. Based on this testimony, we find no clear error. See United States v. Montanari, 863 F.3d 775, 780-81 (8th Cir. 2017) (affirming obstruction-of-justice enhancement based on false statements made during interview with IRS agent).

-20-

## III. CONCLUSION

The convictions and sentence are affirmed.

_____